# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**KIMBERLY A. JACKSON**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**NATALIE FANTETTI**
DCS Miami County Office
Peru, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana



FILED

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE )
TERMINATION OF THE PARENT-CHILD )
RELATIONSHIP OF: )
)
B.H. & B.H. (Minor Children), )
)
And )
)
T.H. (Mother), )
)
Appellant-Respondent, )
)
vs. )  No. 52A02-1210-JT-849
)
THE INDIANA DEPARTMENT OF )
CHILD SERVICES, )
)
Appellee-Petitioner. )

APPEAL FROM THE MIAMI SUPERIOR COURT
JUVENILE DIVISION
The Honorable Daniel C. Banina, Judge
Cause Nos. 52D02-1202-JT-1 & 52D02-1202-JT-2

**May 30, 2013**

**OPINION - FOR PUBLICATION**

**VAIDIK, Judge**

## Case Summary

T.H. ("Mother") appeals the termination of her parental rights to her two young sons. She contends that the trial court erred by qualifying a social worker as an expert witness and allowing that social worker to testify about a parenting assessment called the Child Abuse Potential Inventory ("CAPI"). Although Indiana Code section 25-23.6-4-6 prohibits a licensed clinical social worker from providing expert testimony, Indiana Evidence Rule 702 contains no social-worker exclusion. And because the Indiana Rules of Evidence control when they conflict with a statute, we hold that the social worker in this case was able to testify as an expert witness and was properly qualified as such. We also conclude that CAPI is based upon reliable principles, and therefore the trial court did not err by allowing testimony about Mother's CAPI results. Any error in the admission of other challenged evidence was harmless, and there is sufficient evidence to support the trial court's judgment. We affirm.

## Facts and Procedural History

Mother is the biological mother of B.L.H., born on June 30, 2006, and B.J.H., born on June 21, 2007. Mother's first involvement with the local Miami County Office of the Indiana Department of Child Services ("MCDCS") came in October 2008, when MCDCS removed the children from her care because the home was cluttered and dirty, with trash, food, animal feces, soiled diapers, and other items littered throughout.[1] After Mother entered into an informal adjustment with MCDCS, the children were returned to her care.

---

[1] At the time, Mother was married to the children's biological father. His parental rights have also been terminated. Because he does not participate in this appeal, we limit our discussion to Mother.

In December 2008, MCDCS received a report that Mother was being evicted and had nowhere to live. The children were removed and placed in foster care.

Later that month, MCDCS filed a petition alleging that B.L.H. and B.J.H. were children in need of services ("CHINS"). In February 2009, Mother admitted the allegations in the CHINS petition and the children were adjudicated CHINS. The trial court ordered Mother to participate in a variety of services to facilitate reunification with her children. In pertinent part, Mother was ordered to submit to random drug screens, participate in home-based services, exercise parenting time with the children, secure independent housing and pay all rent and utilities, and work to further her education. At a status hearing in April 2009, the trial court noted that Mother's progress and participation in services was minimal at best.

In 2010, MCDCS filed its first petition to terminate Mother's parental rights. After a hearing in late 2010, the trial court denied MCDCS' petition and ordered additional services for Mother, including an intensive parenting-skills development course. At a status hearing in 2012, however, the trial court concluded that Mother had failed to fully participate in services and had not improved her ability to parent the children. The children's permanency plan was changed to adoption. MCDCS filed its second petition to terminate Mother's parental rights in February 2012, and a termination hearing was scheduled for August 2012.

During the second termination hearing, MCDCS presented evidence establishing that Mother was unable to provide the children with a safe and stable home environment because she failed to secure employment and stable housing or improve her parenting

skills through court-ordered services. Mother admitted that she had trouble finding stable housing and had moved twelve times since the children's removal, paying for only one of those residences herself. Tr. p. 147-51. She was currently living with her brother and sister and her parents were supporting her financially. *Id.* at 152. She said that her children could not live with her at her current residence. *Id.* at 153. Mother had completed lifeguard training and hoped to get a job at the YMCA but acknowledged that she had four years since the boys' removal to find employment and appropriate housing for her children. *Id.* at 162.

A number of service providers who had worked with Mother over the years testified about her ultimately unsuccessful participation in services. Mother had poor attendance and lack of interest in the intensive parenting class she was ordered to attend after the denial of MCDCS' first termination petition, *id.* at 78, refused to participate in individual counseling, *id.* at 152, and showed a poor bond with the children during parenting time, *id.* at 87. The children, however, were thriving in foster care despite being diagnosed with post-traumatic stress disorder and attachment issues. When first placed in foster care, B.L.H., at twenty-eight-months old, could say ten words and hid food, and B.J.H., who was sixteen months old, could not walk normally, could not drink out of a child's cup or chew food, and would go rigid when held. *Id.* at 94-95. Both boys were violent and would sometimes attack each other if left alone. Now, the boys were doing well in school and received counseling and developmental services. *Id.* at 96. B.J.H. had been diagnosed with learning disabilities and was being tested to determine the cause. The foster parents wanted to adopt the boys.

Sara Stolinas, an MCDCS caseworker, reiterated Mother's lack of progress. MCDCS offered Stolinas' written progress reports into evidence as business records. The reports included Stolinas' summaries of Mother's progress as well as other documents such as Mother's counseling records, treatment plans, parenting-time observations, and a number of other parenting-assessment documents. Mother's counsel objected on hearsay grounds, but the trial court admitted the progress reports over the objection and allowed Stolinas to summarize the reports' contents, highlighting Mother's instability in housing and employment and her non-compliance with the case plan. *Id.* at 132-38.

Expert witness Jillorna Uceny gave her recommendation to terminate Mother's parental rights. Uceny is a therapist, social worker, and board certified diplomate with a master's degree in social work. *Id.* at 45. Uceny assessed Mother's parenting skills through a number of individual tests, an interview, and an observation of Mother's interaction with the children.

One of the tests Uceny administered to Mother was the Child Abuse Potential Inventory ("CAPI"). CAPI is used to determine an individual's likelihood of physically abusing children. *Id.* at 44. CAPI was developed at Northern Illinois University in 1977 by Dr. Joel Millner and is widely used and accepted as relevant and reliable by psychiatric professionals. *Id.* at 45-46. It is a standardized test based on five "constructs," and it has been "administered over many . . . samples of people and then normed[,] and so there are three different validity scales in the cap . . . that are used to make sure that we are getting an accurate result." *Id.* at 45. Although CAPI had been the

5

subject of peer-reviewed studies, Uceny said she did not have the studies or statistics in front of her at that time. Over Mother's objection—both as to the qualifications of Uceny to testify as an expert and the reliability of the CAPI test—the trial court allowed Uceny to testify as an expert.

Summarizing the CAPI results, Uceny said that Mother's score was "271 and the cut-off is 166 on the test." *Id.* at 44. Mother's score suggested:

> [T]hat [Mother] has an array of personal characteristics that are similar to known physical child abusers. It also suggests that she is less available to her children and less responsive to any of the temporal changes in the child's behavior and that her ability to form child attachment is less than adequate.

*Id.* Uceny also explained that Mother's CAPI score indicated that the children would be at risk in Mother's care; specifically, at risk from abuse by Mother or someone else without intervention or protection from Mother. Mother's high scores in categories such as "rigidity," "distress," "problems with others," and "ego strength," showed that Mother "had both emotional and cognitive immaturity, a history of untreated depression with only a brief period of medical compliance," "denial and evasion of her responsibilities as a parent," a victim mentality, and low frustration tolerance. *Id*. at 51-52. The parenting assessment also showed that Mother was unable to "be empathetically aware of the children's needs," and that Mother viewed the "needs of [the] children as secondary to her own needs." *Id.* at 52-53. As to Mother's assessment responses about employment, she had "made it clear she did not intend to get a job, that she was waiting for her boyfriend's [social security] to come in and once that happened she was going to marry him and live off his [social security]." *Id.* at 57.

Uceny went on to describe Mother's interaction with the children, recalling that Mother made no effort to have physical interaction with her sons and they did not approach her for physical affection. Uceny summarized her assessment of Mother:

> [I]t is not likely that [Mother] is going to be able to respond to any of the outside services that have been provided to her because of her low level of functioning, both cognitively and emotionally. [I]t means she cannot see or understand that [she needs to] make the changes that she needs to make.

> \* \* \* \* \*

> She did not have a normal, healthy, close bond with the children. It was a very distant, disengaged[,] and cold bond.

*Id.* at 58. Uceny recommended terminating Mother's parental rights.[2]

At the conclusion of the evidentiary hearing, the trial court took the matter under advisement. The following month, the trial court entered its judgment terminating Mother's rights to the children. She now appeals.

**Discussion and Decision**

On appeal, Mother argues that the trial court erred in admitting certain evidence at the termination hearing. Specifically, she challenges Jillorna Uceny's qualification as an expert and the reliability of her testimony pertaining to Mother's CAPI results. Mother also challenges the admission of Sara Stolinas' progress reports and certain testimony

---

[2] On cross-examination, Uceny said that she had not provided Mother's counsel with a copy of the CAPI results because the assessment was protected by the ethics of her profession. Tr. p. 73. However, when questioned, Uceny indicated that if subpoenaed, she could provide the test results to Mother's counsel. *Id.* Mother's counsel again moved to exclude evidence of the test because it was unavailable to counsel. But counsel then admitted that he had not deposed Uceny or subpoenaed her records. *Id.* at 73-74. The objection was overruled.

7

given by Stolinas. Finally, Mother argues that there is insufficient evidence to support the trial court's judgment terminating her parental rights.[3]

## I. Admission of Evidence

The admission of evidence is entrusted to the sound discretion of the trial court. *In re A.J.*, 877 N.E.2d 805, 813 (Ind. Ct. App. 2007) (citation omitted), *trans. denied*. We will find an abuse of discretion only where the trial court's decision is against the logic and effect of the facts and circumstances before the court. *Id.* Not all error is reversible, however. *In re Termination of Parent-Child Relationship of E.T.*, 808 N.E.2d 639, 646 (Ind. 2004) (citing *D.W.S. v. L.D.S.*, 654 N.E.2d 1170, 1173 (Ind. Ct. App. 1995)). "The improper admission of evidence is harmless error when the judgment is supported by substantial independent evidence to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the judgment." *Id.*

### A. Jillorna Uceny and CAPI

At the termination hearing, MCDCS stated that it was not offering Jillorna Uceny, a social worker who had given Mother a parenting assessment, as an expert. However, the trial court found that Uceny was an expert. *See* Tr. p. 49-50. Mother argues that the trial court erred in qualifying Uceny as an expert witness because she is a social worker, which Mother claims is prohibited by Indiana Code section 25-23.6-4-6. Mother also argues that Uceny lacks the necessary expert qualifications under Indiana Evidence Rule

---

[3] Mother notes that MCDCS included three documents in its appellate materials that were not introduced into evidence, and it appears this is correct. For that reason, we do not consider them.

702 and challenges the reliability of Uceny's testimony pertaining to Mother's CAPI results.[4]

In arguing that Uceny was prohibited from giving expert testimony because she is a social worker, Mother relies on this Court's holding in *Velazquez v. State*, 944 N.E.2d 34 (Ind. Ct. App. 2011), *trans. granted*, *opinion vacated*, *order vacated and trans. denied*. The *Velazquez* Court briefly addressed the issue of social workers as expert witnesses, saying:

> While Indiana Code section 25-23.6-4-6 prohibits a licensed clinical social worker from providing expert testimony, it does not prohibit an expert from providing factual testimony. It also cannot prohibit a licensed clinical social worker from being qualified as an expert as Evidence Rule 702(a) allows that a witness may qualify as an expert on the basis of experience alone. *See* Evid. R. 702(a); *Burnett v. State*, 815 N.E.2d 201, 204 (Ind. Ct. App. 2004) ("[A] witness may qualify as an expert on the basis of practical experience alone.").

944 N.E.2d at 43. Mother interprets *Velazquez* to say that a social worker may only give factual testimony. We do not agree. The *Velazquez* Court acknowledged the conflict between Section 25-23.6-4-6 and the Rules of Evidence but said the statute could not prohibit an expert from providing factual testimony *or* "prohibit a licensed clinical social worker from being qualified as an expert as Evidence Rule 702(a) allows . . . ." *Id.*

While Indiana Code section 25-23.6-4-6 prohibits a social worker from offering expert testimony, the statute cannot prevent a trial court from qualifying a social worker as an expert witness. When there is a conflict between a statute and a rule of evidence,

---

[4] Mother additionally argues that MCDCS cannot now argue that Uceny was properly qualified as an expert witness because it did not initially offer her as such at trial. We disagree. While MCDCS may not have planned to offer Uceny as an expert, when the issue arose, the parties argued vigorously about her potential expert-witness qualification. Thus, the issue was brought before the trial court, and the court ruled on the matter, finding that Uceny was an expert witness. Therefore, MCDCS has not waived this argument.

the rule of evidence prevails over any statute. *See Humbert v. Smith*, 664 N.E.2d 356, 357 (Ind. 1996). Indiana Evidence Rule 702 governs the admission of expert testimony, and provides that "If scientific, technical, or other specialized knowledge will assist the trier or fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Ind. Evidence Rule 702(a). Rule 702 has no social-worker exclusion. Thus, because Section 25-23.6-4-6 and Rule 702 are in conflict, Rule 702 controls, and to the extent *Velazquez* can be read to say otherwise, we would disagree. We must now determine whether the trial court erred in determining that Uceny was an expert witness.

> With regard to expert testimony, Indiana Evidence Rule 702 provides:
>
> (a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
>
> (b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

Rule 702 guides the admission of expert scientific testimony by requiring trial courts to be satisfied that expert opinions both assist the trier of fact and are based on reliable principles. *Person v. Shipley*, 962 N.E.2d 1192, 1194 (Ind. 2012) (citations omitted). "A trial court's determination regarding the admissibility of expert testimony under Rule 702 is a matter within its broad discretion and will be reversed only for abuse of that discretion." *Id.* The trial court's decision is presumed to be correct, and the party

10

challenging the decision has the burden of persuading us that the trial court has abused its discretion. *Id.*

A witness is qualified as an expert "by knowledge, skill, experience, training, or education," and only one of these characteristics is necessary. Evid. R. 702(a); *Bennett v. Richmond*, 960 N.E.2d 782, 786 (Ind. 2012) (citations omitted). Uceny has an undergraduate degree in psychology from Purdue University and a master's degree in social work from Indiana University. She is also a board-certified diplomate, which means that she is the highest level of her profession and can make certain diagnoses without medical supervision. Uceny owns and operates Brighter Tomorrows, where she provides therapy and conducts parenting assessments. Uceny testified that she has conducted parenting assessments for more than twenty-five years and learned to administer them under the supervision of a psychologist. As to the specific test at issue, CAPI, Uceny testified about the test's creation, function, and its acceptance and widespread use in the psychiatric community. We conclude that this amount of education, experience, and familiarity with parenting assessments, particularly CAPI, constitutes sufficient knowledge and experience to qualify Uceny as an expert. And Uceny's testimony would clearly assist the trier of fact in understanding the detailed, numeric CAPI results and how those results reflected on Mother's parenting abilities. Mother has not demonstrated that the trial court abused its discretion in qualifying Uceny as an expert witness under Rule 702.

Mother also argues that the trial court erred in allowing Uceny's expert testimony because there was no showing that CAPI is a test based on reliable scientific

methodology or technique. Under Indiana Evidence Rule 702, no specific test is required to establish a scientific process's reliability. *Troxell v. State*, 778 N.E.2d 811, 815 (Ind. 2002) (citing *McGrew v. State*, 682 N.E.2d 1289, 1292 (Ind. 1997)). Instead, trial courts may consider: (1) whether the technique has been or can be empirically tested; (2) whether the technique has been subjected to peer review and publication; (3) the known or potential rate of error, as well as the existence and maintenance of standards controlling the technique's operation; and (4) general acceptance within the relevant scientific community. *Id.* Although all of these factors and others may be relevant, none is by itself dispositive, and not all need to be present for a trial court to find that the proffered evidence rests upon reliable principles. *See Bond v. State*, 925 N.E.2d 773, 779 (Ind. Ct. App. 2010) (*citing McGrew*, 682 N.E.2d at 1292), *trans. denied*.

Uceny testified that CAPI was created in 1977 at Northern Illinois University by Dr. Joel Millner. She testified that CAPI is accepted and used widely in the psychiatric community and has been the subject of peer-review studies. She also explained that CAPI is a standardized test based on five "constructs," and it has been "administered over many . . . samples of people and then normed[,] and so there are three different validity scales in the cap . . . that are used to make sure that we are getting an accurate result." Tr. p. 45. Uceny confirmed that there have been peer-reviewed studies of CAPI, but she was unable to cite specific studies or articles while on the witness stand. Although Mother affords it great weight, Uceny's inability to name specific studies or statistics on the stand is not determinative. *See Bond*, 925 N.E.2d at 779 ("Although all of these factors and others may be relevant, none is by itself dispositive, and not all need be present for a trial

12

court to find the proffered evidence rests upon reliable principles."). We conclude that Uceny's testimony was sufficient to establish CAPI's reliability.

*B. Sara Stolinas' Progress Reports and Testimony*

Mother claims that the trial court erred by admitting Sara Stolinas' progress reports and by allowing Stolinas to testify about Mother's compliance and participation in services. At trial, Mother objected to the admission of the progress reports on hearsay grounds. In addition to Stolinas' summaries of Mother's progress, the reports included other documents such as Mother's counseling records, treatment plans, parenting-time observations, and a number of other parenting-assessment documents. MCDCS argued that the reports satisfied the business-record exception to the hearsay rule.

On appeal, MCDCS no longer relies on the business-record exception; it concedes the records do not satisfy the exception's requirements. Appellee's Br. p. 23. However, MCDCS argues that the progress reports were not admitted for the truth of the matter asserted, but rather "to show why [MC]DCS had filed for termination of Mother's parental rights." *Id.* at 22. But even if this were so, the probative value of these reports to show why termination was sought was substantially outweighed by the danger of unfair prejudice given their contents. *See* Ind. Evidence Rule 403 ("[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."). Thus, we conclude that the trial court erred in admitting the progress reports. Although this was error, not all error is reversible. "The improper admission of evidence is harmless error when the judgment is supported by substantial independent evidence to satisfy the reviewing court that there is no substantial likelihood

13

that the questioned evidence contributed to the judgment." *In re E.T.*, 808 N.E.2d at 646 (citing *D.W.S.*, 654 N.E.2d at 1173).  Notably, the trial court's judgment terminating Mother's parental rights does not refer to the progress reports or their contents, and as explained below, there is sufficient independent evidence to satisfy the court's judgment in this case.  This error was therefore harmless.

Mother also argues that the trial court erred by allowing Stolinas to testify about Mother's participation in services and her overall compliance with the case plan.  At the termination hearing, Mother objected to Stolinas giving an opinion on this issue because of her lack of personal knowledge.  Stolinas admitted that the majority of her knowledge regarding Mother's compliance came from service provider's statements to her, which would be inadmissible hearsay.  To the extent Stolinas' testimony was based upon the progress reports and therefore error, it was brief and cumulative of other testimony regarding Mother's participation and compliance with court-ordered services, and was therefore harmless error.

## II. Termination of Parental Rights

The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children.  *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010).  "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty issues.'"  *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)).  "Indeed[,] the parent-child relationship is 'one of the most valued relationships in our culture.'"  *Id.* (quoting *Neal v. DeKalb Cnty. Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)).  Nevertheless, parental

rights are "not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights." *Id.* (citing *In re D.D.*, 804 N.E.2d 258, 264-65 (Ind. Ct. App. 2004), *trans. denied*).

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005) (citation omitted). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Here, the trial court made specific findings and conclusions in its termination order. When a trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.B.*, 888 N.E.2d 231, 235 (Ind. Ct. App. 2008) (citation omitted), *trans. denied*.

In Indiana, before parental rights may be involuntarily terminated, the State is required to allege and prove, among other things:

   (B)   that one (1) of the following is true:

      (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

      (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)    that termination is in the best interests of the child; and

(D)    that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).[5]   In addition, the State has the burden of pleading and proving each element of Indiana Code section 31-35-2-4(b) by "'clear and convincing evidence'" before the trial court can involuntarily terminate parental rights.   *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2).   On appeal, Mother challenges the sufficiency of the evidence supporting the trial court's judgment as to subsection (B) of the termination statute detailed above.   *See* Ind. Code § 31-35-2-4(b)(2)(B).[6]

Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive.   The trial court therefore had to find only that one of the three requirements of subsection 2(B) had been met before terminating Mother's parental rights.   *In re L.V.N.*, 799 N.E.2d 63, 69 (Ind. Ct. App. 2003).   Nevertheless, the trial court found sufficient evidence had been presented to satisfy the evidentiary requirements of subsections 2(B)(i) and 2(B)(ii).   Because we find it to be dispositive, we address only whether the evidence shows that

---

[5]   Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012).   The changes to the statute became effective after the filing of the termination petition in this case and are therefore not applicable here.

[6] For the first time at the close of her brief, Mother references the trial court's conclusion that termination of her rights was in the children's best interests, apparently challenging this conclusion.   *See* Appellant's Br. p. 45.   Mother's only arguments on this issue are that the cause of one of the children's developmental delays has yet to be determined, that she did not abuse the children when they were in her care, and that her difficulties with the children during parenting time was a result of the children's bond with their foster parents.   These brief arguments amount to nothing more than an invitation to reweigh the evidence, and they do not persuade us that the trial court erred in concluding that termination was in the children's best interests.

16

there is a reasonable probability that the conditions resulting in the children's removal or continued placement outside Mother's care will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

When making this determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re I.A.*, 903 N.E.2d 146, 154 (Ind. Ct. App. 2009) (citations omitted). The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id.* Similarly, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* The trial court may also consider the services offered to the parent and the parent's response to those services, as evidence of whether conditions will be remedied. *Id.*

The purpose of terminating parental rights is not to punish the parent but to protect the children involved. *In re D.B.*, 942 N.E.2d 867, 872 (Ind. Ct. App. 2011) (citing *In re K.S.*, 750 N.E.2d 832 (Ind. Ct. App. 2001)). The involuntary termination of parental rights is the most extreme sanction a court can impose on a parent because termination severs all of a parent's rights to his or her children. *Id.* (citing *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008)). "Termination of parental rights is therefore intended as a last resort, available only when all other reasonable efforts have failed." *Id.*

In determining that there is a reasonable probability the conditions resulting in the children's removal or continued placement outside Mother's care will not be remedied,

17

the trial court set forth the evidence regarding Mother's inability to provide a safe and stable home environment for her sons.[7]  *See* Appellant's App. p. 45-63.[8]  Specifically, Mother failed to fully participate in or benefit from the wide variety of services offered to her, including home-based programs, supervised parenting time, parenting assessments, parenting programs, psychological and psychiatric evaluations, and individual counseling.  Even when Mother got a second chance—the trial court denied MCDCS' 2010 petition to terminate Mother's parental rights and ordered additional services—her participation and compliance did not improve.  In the years since the children's removal, Mother has made little to no progress in areas of concern and did not demonstrate an understanding of the children's needs required to parent them appropriately.

Service providers detailed Mother's lack of progress in her ability to parent the children.  Uceny testified that the children were at risk of being abused if returned to Mother's care, and that her assessment of Mother indicated that Mother was not likely to benefit from the services being offered to her because her low cognitive functioning and emotional immaturity.  Uceny explained that Mother viewed the children's needs as secondary to her own and had indicated no interest in working or supporting herself financially.  Uceny recommended terminating Mother's parental rights.  The record also shows that Mother refused to participate in individual counseling and missed nearly half of the sessions in her intensive parenting-skills course, rarely completing her

---

[7] Mother takes issue with the trial court's verbatim adoption of MCDCS' proposed findings and conclusions.  But as she concedes, verbatim adoption of a party's proposed findings and conclusions, while not the favored practice, is not prohibited.  *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1249 (Ind. Ct. App. 2002) (citations omitted), *trans. denied*.

[8] There is a separate termination order for each child.  The order for B.J.H. spans pages 45-53 of the Appellant's Appendix, and the order for B.L.H. is found on pages 54-63.

corresponding homework assignments. Some parenting-skills sessions had to end early because Mother would yawn, text, or play with her phone during the sessions. Mother's number-one priority was herself, not the children. Meanwhile, the children were thriving, both physically and emotionally, in their foster-care placement.

In addition to failing to improve her parenting skills, Mother also failed to resolve her housing and employment issues. Throughout the case, she lacked stable or significant employment. Mother moved twelve times since the children's removal and she paid for only one of those residences. At the time of the termination hearing, Mother was unemployed and financially supported by her parents. She was living with her brother and sister in a two-bedroom apartment, and she testified that the children could not live there.

The bulk of Mother's arguments regarding the sufficiency of evidence supporting termination hinge on her claims that certain evidence—particularly Uceny's testimony—was inadmissible, and because we have found otherwise, these arguments are not persuasive. The remaining arguments amount to invitations to reweigh the evidence; specifically, Mother argues that termination of her rights was premature and that "DCS provided some services but did not make substantial efforts" to reunify her with her children. Appellant's Br. p. 42. She also contends that she was more engaged in services than the trial court's judgment reflects, her inability to obtain housing and employment is a result of the poor economy and a past felony conviction, and she may soon begin work as a lifeguard. *Id.* at 42-43, 45. We do not accept Mother's invitation to reweigh the evidence, and note that her claims find little to no support in the record.

19

Instead, our review of the record shows that since the time of the children's removal four years ago, Mother has demonstrated a persistent unwillingness and inability to take the steps necessary to show she is capable of parenting her children and providing them with a safe and stable home environment, despite MCDCS' ongoing efforts. There is clear and convincing evidence to support the trial court's findings and the court's ultimate determination that there is a reasonable probability the conditions leading to the children's removal and continued placement outside Mother's care will not be remedied. We therefore affirm the trial court's judgment terminating Mother's parental rights.

Affirmed.

KIRSCH, J., and PYLE, J., concur.