

**FILED**

Mar 23 2020, 8:51 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT D.B.

Heather M. Schuh-Ogle
Thomasson, Thomasson, Long &
Guthrie, P.C.
Columbus, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of: De.B., a Child
Alleged to be in Need of
Services,

J.B. (Mother) and D.B. (Father),

*Appellants-Respondents,*

v.

Indiana Department of Child
Services,

*Appellee-Petitioner*

March 23, 2020

Court of Appeals Case No.
19A-JC-2228

Appeal from the
Bartholomew Circuit Court

The Honorable
Kelly S. Benjamin, Judge

The Honorable
Heather Mollo, Magistrate

Trial Court Cause No.
03C01-1902-JC-872

**Vaidik, Judge.**

# Case Summary

[1] Indiana Evidence Rule 803(6) provides an exception to the rule against hearsay for records of a "regularly conducted activity" of a business or other organization. This is commonly referred to as the "business-records exception." Here, during a child in need of services (CHINS) fact-finding hearing, the Department of Child Services (DCS) offered into evidence lab reports purporting to show the results of the parents' drug tests under the business-records exception. The trial court found that the lab reports were business records and therefore admitted them. On appeal, D.B. ("Father") argues that the lab reports are not business records. We find that they are and affirm the trial court on that issue and in all other respects.

# Facts and Procedural History

[2] Father and J.B. ("Mother") (collectively, "Parents") are the parents of De.B. ("Child"), who was born in June 2018. On February 13, 2019, an officer with the Columbus Police Department stopped Parents' car after receiving a report that a theft had just occurred at a nearby Target. Father was in the driver's seat, Mother was in the passenger's seat, and Child was in a car seat in the back seat. During the stop, Mother said that "she committed the theft so that she could . . . sell the items that she had stolen, to get food." Tr. p. 54. The officer then searched the car and found several electronic items from Target, some syringes, and a bent spoon. *See id.* Parents were both arrested and transported to the police department to be interviewed. A detective interviewed Father, who

admitted that he was the "getaway driver" for the Target theft and that they planned to sell the stolen items "to pay for baby supplies." *Id.* at 60-61. Father also told the detective that the syringes and spoon were Mother's and that "he prefers to snort his" methamphetamine.[1] *Id.* at 59-60.

[3] Because Child was with Parents when they were arrested and there was no other caregiver available for Child, police officers contacted DCS. Family Case Manager (FCM) Christine McKitrick arrived at the police station to remove Child and place her in foster care. While FCM McKitrick was at the station, Mother told her that Father "uses THC." *Id.* at 67. The next day, DCS filed a petition alleging that Child is a CHINS. A fact-finding hearing was set for April 5.

[4] Father provided oral-fluid samples for drug testing twice before the fact-finding hearing: one to DCS employee Susie Hodnett on February 19 and one to FCM McKitrick on March 4. Mother provided four oral-fluid samples for drug testing before the fact-finding hearing: one to FCM McKitrick on February 14, one to Hodnett on February 19, another one to FCM McKitrick on March 4, and one to DCS employee Collin Huston on March 19. On March 20, DCS filed a motion requesting permission for Bridget Lemberg to testify telephonically at the fact-finding hearing. The motion indicated that Lemberg was the lab director and a toxicologist at Forensic Fluids in Kalamazoo,

---

[1] Father eventually pled guilty to Class A misdemeanor criminal conversion, and Mother pled guilty to Level 6 felony unlawful possession of a syringe.

Michigan, that she was going to testify that Forensic Fluids tested Parents' oral-fluid samples, and that requiring her to travel and testify in person would cause a great burden and inconvenience. *See* Appellant's App. Vol. II pp. 28-29. Father objected based on DCS's failure to comply with Indiana Administrative Rule 14(B), which sets forth the procedural requirements for telephonic testimony in a CHINS fact-finding hearing.

[5]     On April 5, the CHINS fact-finding hearing began. Both Father and Mother admitted to using marijuana during the pendency of the CHINS case. Tr. pp. 18-19, 27. Father renewed his objection to Lemberg testifying telephonically. The trial court overruled Father's objection and allowed Lemberg to testify. Lemberg said that Forensic Fluids is a "federally certified toxicology laboratory that does oral fluid drug testing," subject to the Clinical Laboratory Improvement Amendments ("CLIA"), 42 U.S.C. § 263a (2012). *Id.* at 29. Lemberg then testified generally about how oral-fluid samples are processed, starting when Forensic Fluids receives a UPS delivery each morning containing individual plastic specimen bags that contain donors' oral-fluid samples and ending when the lab report, reporting the results of the drug test, is created. Lemberg stated that a lab report showing the drug-test results—positive or negative—is created for every result that comes out of Forensic Fluids. *Id.* at 41. When asked, Lemberg admitted that she did not personally process Parents' oral-fluid samples. Father's attorney therefore objected to Lemberg testifying about the results of Parents' oral-fluid drug tests because her testimony was based on hearsay. The trial court overruled the objection.

Lemberg then testified that Father tested positive for marijuana on February 19 and March 4 and that Mother tested positive for marijuana on March 19 and tested positive for marijuana and methamphetamine on February 14 and March 4. *See id.* at 35, 40.

[6] Lemberg also said that the lab reports are made the same day that the results are transmitted and that Forensic Fluids is required to keep lab reports to maintain their federal CLIA certification. *See id.* at 41. DCS then moved to admit the lab reports showing the results of Parents' oral-fluid drug tests under Indiana Evidence Rule 803(6), the business-records exception. Father's attorney objected, arguing that the lab reports were "specifically created for DCS" and that therefore they did not qualify as business records. *Id.* at 41. Mother's attorney joined in the objection. Lemberg explained that Forensic Fluids "ha[s] to keep [the lab reports] for two years for the federal government," *id.* at 42, and on that basis, the trial court overruled Parents' objection and admitted the lab reports.

[7] On cross-examination by Father's attorney, Lemberg provided additional information about Forensic Fluids' operations. Lemberg said that to keep their certification, Forensic Fluids is also "physically inspected every twelve to eighteen months, and [Forensic Fluids] do[es] blind sample testing, and [has] standard operating procedures." *Id.* at 45. Lemberg also said that lab supervisors do quarterly and annual performance evaluations, and that "to keep [Forensic Fluids'] Federal Certificate, everybody has to be re-trained on all the pieces of equipment . . . on a yearly basis, and it has to go in [the employee's]

folder, so that the Federal Government can see that they've had training every year." *Id.* Lemberg testified that performance evaluations consist of lab supervisors observing employees "while they're working" and that "[t]hey're also given blank or blind samples to test." *Id.*

[8] Home-based case worker Anne Moore testified that Father attended eleven out of fifteen visits with Child. *Id.* at 49. Moore said that Parents "d[id] a pretty good job" during visits but that in early March "they asked to reduce to two visits a week . . . [b]ecause they said they had so much to do for DCS." *Id.* at 50. FCM Stacy Prior testified that she was concerned because Parents did not have a consistent living situation or consistent employment and that both parents had positive drug screens. *Id.* at 71. FCM Prior said that although Parents had recently obtained suitable housing, she was still concerned because Parents "moved in approximately three days ago." *Id.* Father testified that he was unemployed and had three jobs in the past year. *Id.* at 26. Father said that he lost his most recent job due to a hand injury and that he believed that his church was going to set up a fund to help him until he could get back on his feet. *Id.* at 86.

[9] On June 6, the trial court issued an order adjudicating Child a CHINS pursuant to Indiana Code section 31-34-1-1. The trial court entered findings to support its order, which include:

> 5.     [Parents] were arrested for retail theft on or about February 13, 2019.

6.     At the time of [P]arents' arrest, [Child] was present with [P]arents.

7.     In the course of the arrest of [P]arents, law enforcement found two syringes, a bent spoon and a torch lighter.

*****

22.     The underlying events that brought [P]arents to the attention of law enforcement and DCS portray either desperate living circumstances or very poor judgment by [P]arents having their infant daughter present while committing an act of theft.

23.     With the drug related items found in the car, the positive drug screens for methamphetamine, and the admissions by [P]arents to officials, there is evidence that substance abuse is a present concern for both parents that warrants monitoring and services.

24.     The tender age of [Child] is a factor, given her total dependence on others for her care. It is also questionable as to whether either parent can be a protective factor for [Child], by being a sober caregiver.

25.     The stability of [Parents] is hopeful but tenuous, as things were just starting to fall into place at the time of trial.

Appellant's App. Vol. II pp. 14-15.

[10]     On June 24, the trial court held a dispositional hearing. FCM Prior testified that Parents were both unemployed and seeking housing. Tr. p. 99. FCM Prior said that Parents were staying at a shelter but continued to be involved with

home-based case management and were consistently attending supervised visits with Child. *Id.* FCM Prior requested that Father continue participating in supervised visitation, engage in random drug screens, complete a psychological evaluation, and participate in home-based case management. *Id.* at 102. FCM Prior said that Father had completed a substance-abuse assessment and had been referred to in-patient treatment. *Id.* At the end of the hearing, the trial court adopted DCS's recommendations and ordered Parents to participate in services.

[11] Father now appeals (but Mother does not).

# Discussion and Decision

[12] Father contends that the trial court erred by admitting the lab reports from Forensic Fluids. He also argues that there is insufficient evidence to support the trial court's CHINS adjudication.

# I. Lab Reports

[13] Father argues that the trial court erred by determining that the lab reports fit within the business-records exception. The admission of evidence is entrusted to the sound discretion of the trial court. *In re B.H.*, 989 N.E.2d 355, 360 (Ind. Ct. App. 2013). We will find an abuse of discretion only where the trial court's decision is against the logic and effect of the facts and circumstances before the court. *Id.* Not all error is reversible, however. *Id.* The improper admission of evidence is harmless error when the judgment is supported by substantial

independent evidence to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the judgment. *Id.*

[14] Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted. Ind. Evidence Rule 801(c). Hearsay is not admissible unless it falls under certain exceptions. Ind. Evidence Rule 802. The business-records exception, Indiana Evidence Rule 803(6), provides that a record of an act, event, condition, opinion, or diagnosis is admissible if:

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(9) or (10) or with a statute permitting certification; and
>
> (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

The reliability of business records stems in part from (1) the fact that the organization depends on them to operate, (2) the sense that they are subject to review, audit, or internal checks, and (3) the precision engendered by the

repetition. *In re E.T.*, 808 N.E.2d 639, 642-43 (Ind. 2003) (citing *Stahl v. State*, 686 N.E.2d 89, 92 (Ind. 1997)).

[15] Recently, a panel of this Court held, in *In re L.S.*, that a mother's Forensic Fluids lab reports did not fall under the business-records exception and therefore excluded them. 125 N.E.3d 628, 634 (Ind. Ct. App. 2019), *trans. not sought*. In that case, Lemberg's affidavits explained that the lab reports had been maintained in the normal course of Forensic Fluids' business activity as business records. However, citing *In re E.T.*, the panel determined that "what we consider is whether a business depends on those records to function." *Id.* The panel found that "Forensic Fluids Laboratories does not depend on these records to operate or conduct business. Rather, the [lab reports] were documented for the benefit of DCS." *Id.* Therefore, the panel concluded that the lab reports were inadmissible as hearsay.[2, 3]

[16] For two reasons, we respectfully disagree with the holding in *L.S.* First, Forensic Fluids **does** depend on the lab reports to operate. That is, Lemberg testified that Forensic Fluids is required to create and keep lab reports for two years to maintain its federal CLIA certification. The CLIA also requires that certified labs retain the slides, blocks, or tissue samples that formed the basis of

---

[2] The *L.S.* panel found that, even excluding the lab reports, there was substantial independent evidence supporting the trial court's termination order. Neither party sought transfer.

[3] A different panel of this Court held in *In re K.R.* that Forensic Fluids lab reports were business records. 133 N.E.3d 754, 762 (Ind. Ct. App. 2019), *trans. granted*. Our Supreme Court granted transfer in that case, and oral argument is scheduled for April 16, 2020. *See* 20S-JT-63.

the information contained in the lab reports. *See* 42 C.F.R. § 493.1105 (2003); *see also* 42 C.F.R. § 493.1773 (1998) (explaining that a lab may be required to test samples while being observed by agents from the Centers for Medicare and Medicaid Services (CMS)). A CLIA certified lab is further required to allow CMS to access its storage facilities for specimens, reagents, records, and reports. *See* 42 C.F.R. § 493.1773 (1998). All of this shows that if Forensic Fluids does not maintain lab reports for two years it would lose its certification and, presumably, its business.

[17] Second, the *L.S.* panel did not consider the other two indicators of reliability mentioned by our Supreme Court in *In re E.T.*: (1) the records being subject to review, audit, or internal checks and (2) the precision engendered by repetition. *See* 808 N.E.2d at 642-43. Here, Lemberg testified that Forensic Fluids is subject to physical inspection by the federal government every twelve to eighteen months and that Forensic Fluids does blind-sample testing. *See* Tr. p. 45. Furthermore, Lemberg testified that a lab report is routinely created for every result rendered by Forensic Fluids. *See id.* at 41. Thus, because Forensic Fluids depends, at least in part, on the lab reports to operate, the lab reports are subject to federal review and internal checks, and the lab reports are created for

every result rendered by Forensic Fluids, we find that the trial court did not err by admitting the lab reports under the business-records exception.[4]

[18] Father also argues that "[t]here was no foundational testimony regarding the collection of the [drug] screen[s] beyond [Lemberg's] statements as to who the collector was and the date of the collection." Appellant's Br. p. 17 n. 3; *see also* Appellant's Reply Br. p. 9. In other words, Father contends that DCS failed to prove that the oral-fluid samples addressed in the lab reports were the same samples that Parents provided. This appears to be a challenge to the chain of custody for the samples. DCS bears a higher burden to establish the chain of custody of "fungible" evidence, such as blood and hair samples, whose appearance is indistinguishable to the naked eye. *Troxell v. State*, 778 N.E.2d 811, 814 (Ind. 2002). To establish a proper chain of custody, DCS must give reasonable assurances that the evidence remained in an undisturbed condition. *Id.* However, DCS need not establish a perfect chain of custody, and once DCS strongly suggests the exact whereabouts of the evidence, any gaps go to the weight of the evidence and not to admissibility. *Id.* To mount a successful challenge to the chain of custody, one must present evidence that does more than raise a mere possibility that the evidence may have been tampered with. *Id.*

---

[4] *In re E.T.* also established that if the business record at issue includes an opinion, the expertise of the opinion giver must be established. 808 N.E.2d at 644. Father doesn't argue that the lab reports at issue here include opinions, so we do not address this additional requirement.

[19]     It is true that there is little in the record about the chain of custody for the oral-fluid samples before they arrived at Forensic Fluids. There is evidence that FCM McKitrick, Hodnett, and Huston collected Parents' oral-fluid samples, but there is no evidence of what they did with the samples after collecting them. However, this lack of evidence might be due to the fact that Father did not make a chain-of-custody objection at the fact-finding hearing. Because no objection was made to the trial court, we cannot say that the trial court erred by admitting the lab reports for a lack of chain of custody. In any event, even if we believed that the trial court erred by admitting the lab reports, the fact remains that Father and Mother both admitted—**at the fact-finding hearing, before the lab reports were even admitted**—that they used marijuana during the pendency of this case. Therefore, any possible error was harmless.[5]

## II. Sufficiency of the Evidence

[20]     Father also challenges the sufficiency of the evidence supporting the trial court's CHINS adjudication. A CHINS proceeding focuses on the best interests of the

---

[5] Father also raises two issues regarding the admission of Lemberg's testimony. First, he argues that the procedure outlined in Indiana Administrative Rule 14(B) was not followed and that therefore the trial court erred by allowing Lemberg to testify telephonically. Administrative Rule 14(B) provides, among other things, that a motion for telephonic testimony must be served not less than thirty days before the time specified for a hearing and that a court is required to enter written findings of fact and conclusions of law before a person can testify telephonically. Neither requirement was satisfied here. But even if the trial court erred by allowing Lemberg to testify telephonically about Parents' drug-test results, because of Parents' admissions—that they used marijuana during the pendency of the CHINS case—we do not find any reversible error.

He also argues that Lemberg's testimony about the results of the drug tests was hearsay because she did not personally process Parents' oral-fluid samples. However, because the lab reports themselves were properly admitted under the business-records exception to the hearsay rule, we see no error in her testifying about the results.

children, not the guilt or innocence of the parents. *In re D.P.*, 72 N.E.3d 976, 980 (Ind. Ct. App. 2017). The purposes of a CHINS case are to help families in crisis and to protect children, not to punish parents. *Id.* A CHINS proceeding is civil in nature, so the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). Indiana Code section 31-34-1-1 provides that a child is a CHINS if, before the child becomes eighteen years of age:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision:
>
>> (A) when the parent, guardian, or custodian is financially able to do so; or
>>
>> (B) due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
>> (A) the child is not receiving; and
>>
>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

In other words, this statute requires "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs

are unmet, and . . . that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014), *reh'g denied*. The final element "guards against unwarranted State interference in family life, reserving that intrusion for families where parents lack the ability to provide for their children, not merely where they encounter difficulty in meeting a child's needs." *Id.*

[21] When determining whether there is sufficient evidence to support a CHINS determination, we neither reweigh the evidence nor judge the credibility of the witnesses. *In re D.F.*, 83 N.E.3d 789, 796 (Ind. Ct. App. 2017). Rather, we consider only the evidence that supports the trial court's determination and reasonable inferences drawn therefrom. *Id.* Where, as in this case, the trial court enters findings and conclusions sua sponte, we apply the two-tiered standard of whether the evidence supports the findings, and whether the findings support the judgment for the issues covered by the findings. *S.D.*, 2 N.E.3d at 1287. Findings are clearly erroneous when there are no facts or inferences drawn therefrom that support them. *In re A.G.*, 6 N.E.3d 952, 957 (Ind. Ct. App. 2014). A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the resulting judgment. *Id.*

[22] In its order, the trial court expressed concern about Parents' drug use and questioned whether they could be sober caregivers. *See* Appellant's App. Vol. II p. 15 (Findings 23, 24). The trial court also found that things were just starting to fall into place and expressed concern about Parents' stability. *See id.* (Finding

25).  Although Father challenges these findings, our review of the record reveals that there is ample evidence to support them.  At the fact-finding hearing, FCM McKitrick testified that Mother told her that Father "uses THC," the detective testified that Father said that "he prefers to snort his" methamphetamine," and both Father and Mother admitted that they used marijuana during the pendency of this case.  Tr. pp. 18-19, 27, 59-60, 67, 88.  The lab reports showing Parents' positive results were also admitted into evidence.[6]  Regarding Parents' stability, FCM Prior said that Parents obtained suitable housing only three days before the fact-finding hearing.  All of this supports the trial court's Findings 23, 24, and 25.  Moreover, the trial court made findings that Father does not challenge, which also support its CHINS adjudication.  Specifically, Father does not challenge Findings 7 (that two syringes, a bent spoon, and a torch lighter were found in the same car as Child) and 22 (Parents' desperate living circumstances may have led them to commit theft and Child was with Parents while they committed theft).  Any unchallenged findings stand as proven.  *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007), *trans. denied*.  All of this supports the trial court's conclusion that Child needed services.  We therefore conclude that the trial court did not err in adjudicating Child a CHINS.

[23]  Affirmed.

Tavitas, J., concurs.

---

[6] Father also challenges Findings 11 and 12, which address Mother and Father's lab reports respectively. Even if the lab reports were improperly admitted, there is ample evidence to support the trial court's CHINS adjudication.

Najam, J., concurs in result.