**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Dec 22 2014, 9:33 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT H.G.:

**JUSTIN R. WALL**
Wall Legal Services
Huntington, Indiana


ATTORNEY FOR APPELLANT J.H.:

**WILLIAM B. HOGG**
William B. Hogg, Attorney at Law
Huntington, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**DAVID E. COREY**
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) ) ) ) | |
| D.H. and J.H. (Minor Children) | ) ) | |
| and | ) ) | |
| H.G. (Mother) and J.H. (Father), | ) ) | |
| Appellants-Respondents, | ) ) | |
| vs. | ) ) | No.  35A02-1407-JT-474 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) | |

**December 22, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

H.G. (Mother) and J.H. (Father) appeal the judgment of the juvenile court terminating the parent-child relationship between themselves and their children, D.H. and J.H. Finding that the Indiana Department of Child Services (DCS) presented the juvenile court with clear and convincing evidence from which it could properly conclude that there is a reasonable probability that the conditions that resulted in the children's removal will not be remedied and that termination of the parent-child relationship is in the children's best interests, we affirm.

## FACTS

Mother and Father are the parents of D.H., born in January 2012, and J.H., born in January 2011. J.H. suffers from several medical conditions including morbid obesity and Chromosome 14 abnormalities. At eighteen months old, J.H. weighed approximately thirty-five pounds and had yet to begin walking as a result. J.H. requires a daily dose of the drug Synthroid, which is used to treat hyperthyroidism. If J.H. is not given this medication, developmental disabilities can result. Additionally, both children suffered from chronic ear infections.

2

In September 2012, DCS received a report alleging that Mother and Father were not properly addressing J.H.'s health needs. A family case manager (FCM) went to the home and observed the children in an extremely dirty pack-n-play, in which they slept every night, wearing soiled clothing. The FCM questioned Mother about J.H.'s medical conditions and Mother admitted that she was not giving J.H. her medication consistently. Empty bottles of milk were found in the pack-n-play, as Mother and Father had been allowing the children to feed themselves throughout the night. At the end of the meeting, Mother and Father signed a safety plan agreeing that they would give J.H. her medication as instructed, supervise the children, maintain the home in a safe and clean manner, and participate in home-based parenting instruction.

A few weeks later, DCS received another report expressing concern over the supervision of the children and the safety of the home. A pill count revealed that J.H. had barely been given any of the medication she had recently been prescribed. Empty bottles of milk were again found in the pack-n-play. The children were found unbathed and wearing soiled diapers, which resulted in an extremely foul odor on the children and throughout the home. During a subsequent visit, Father became belligerent with an FCM who had asked Mother to wake Father up to assist in cleaning dog feces off of the floor of the children's room and to change the children's diapers.

On October 18, 2012, DCS filed a petition with the juvenile court alleging the children to be Children in Need of Services (CHINS). Following an initial hearing held on November 7, 2012, the juvenile court granted the petition and scheduled a

dispositional hearing. On December 4, 2012, the juvenile court entered a dispositional decree allowing the children to remain at home, ordering both parents to participate in home-based parenting instruction, and ordering Mother to complete a mental health evaluation. Mother completed her mental health assessment but neither Mother nor Father ever participated in court-ordered parenting instruction despite efforts made by the service provider to schedule appointments.

On January 1, 2013, DCS received a phone call alleging that Mother and Father were manufacturing methamphetamine in their home while the children were present. The FCM who took the call phoned the police department. The police department sent a detective, who went along with the FCM to inspect the situation. They arrived to find a house entirely filled with smoke that emitted a strong chemical odor. The children were on the floor of the living room. A subsequent search of the house revealed many spent meth labs as well as trash bags containing meth-related materials. Both Mother and Father admitted to manufacturing meth while the children were in the home on multiple occasions. The home was condemned due to contamination from the manufacturing process.[1]

On January 3, 2013, the juvenile court held a detention hearing and ordered the children removed from the home. DCS attempted to place the children with relatives, but, as no relatives were available, the children were placed in foster care. At the time, J.H. was twenty-three months old and D.H. was eleven months old. On February 26,

---

[1] The home was decontaminated by the Indiana Department of Environmental Management and "released" as of August 9, 2013. Tr. p. 77.

2013, Mother and Father each pleaded guilty to one count of dealing in methamphetamine and two counts of neglect of a dependent. On March 26, 2013, both were sentenced to executed terms of twelve years imprisonment. Today, Mother and Father remain incarcerated and the children remain in foster care. Mother expects to be released in July 2018 and Father in January 2019.

On March 27, 2014, the juvenile court held a fact-finding hearing. The Guardian Ad Litem (GAL) submitted a report recommending that the parent-child relationship be terminated and the children be adopted by their current foster parents. On April 2, 2014, the juvenile court issued an order authorizing DCS to file a petition to terminate the parent-child relationship. On July 25, 2013, DCS filed this petition. The juvenile court held a fact-finding hearing, during which an FCM also recommended that the parent-child relationship be terminated and the children be adopted by their current foster parents. On June 9, 2014, the juvenile court entered an order terminating the parent-child relationship between Mother and Father and the children. Mother and Father now appeal.

DISCUSSION AND DECISION

The Fourteenth Amendment to the United States Constitution protects the right of parents to raise their children. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). However, parental interests are not absolute, and if parents are unable or unwilling to meet their parental responsibilities, their interests must be subordinated to those of their children. Id. In appropriate circumstances, a juvenile court may order the parent-child relationship terminated. Id. The purpose of terminating a

5

parent-child relationship is not to punish the parents but to protect their children.  In re S.P.H., 806 N.E.2d 874, 880 (Ind. Ct. App. 2004).  A juvenile court "need not wait until a child is irreversibly harmed before terminating the parent-child relationship."  In re N.Q., 996 N.E.2d 385, 391 (Ind. Ct. App. 2013).

When reviewing a juvenile court's decision to terminate a parent-child relationship, we neither reweigh the evidence nor judge the credibility of the witnesses.  Bester, 839 N.E.2d at 147.  We consider only the evidence favorable to the judgment and the reasonable inferences drawn therefrom.  Id.

Here, the trial court entered findings of fact and conclusions of law.  In such a case, we employ a two-tiered standard of review.  Id.  We first determine whether the evidence supports the findings, and then determine whether the findings support the judgment.  Id.  We will only set aside the juvenile court's judgment if it is clearly erroneous.  Id.  A judgment is clearly erroneous if the findings do not support the conclusions or the conclusions do not support the judgment.  Id.

Indiana Code section 31-35-2-4 requires that a petition to terminate a parent-child relationship, in relevant part, must contain the following:

(2) The petition must allege:

   (A) that one (1) of the following is true:

      (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
      . . .

   (B) that one (1) of the following is true:

6

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

. . .

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

The State must prove the allegations by clear and convincing evidence. Ind. Code § 31-37-14-2. "Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." Bester, 839 N.E.2d at 148 (quotations omitted).

Both Mother and Father admit that the children were removed from their custody for at least six months under a dispositional decree prior to the filing of the petition. Mother's Br. p. 13; Father's Br. p. 12. However, both argue that DCS has failed to prove elements (2)(B)(i), (2)(B)(ii), or (2)(C) by clear and convincing evidence.

### I. Reasonable Probability That Conditions Will Not Be Remedied

Mother and Father first take issue with the juvenile court's conclusion that "there is a reasonable probability that the conditions that resulted in the child's removal or the

reasons for placement outside the home of the parents will not be remedied." I.C. § 31-35-2-4(b)(2)(B)(i). In making this determination, the juvenile court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration evidence of changed conditions. In re A.B., 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). The juvenile court must also evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the children. Id. A juvenile court may properly consider circumstances such as a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). DCS is not required to rule out any possibility of change, rather, it only needs to show that there is a reasonable probability that the parent's behavior will not change. In re A.B., 924 N.E.2d at 670.

## A. Mother

Mother argues that "financial hardship was a significant factor that contributed to the neglect and medical treatment issues" involving her children. Mother's Br. p. 17. Mother asserts that she has recently received $75,000, implying that some of this money could be used to provide for her children upon her release. Id. She further notes "that it was ultimately the meth lab issue . . . that caused the Children to be physically removed from [her] care." Id. at 18. Mother asserts that it was Father who was manufacturing and consuming meth, and that she was merely purchasing the precursors necessary for its production. Id.

8

While these points may indicate a possibility of change, we reiterate that the juvenile court must judge a parent's fitness at the time of the hearing and must look to the probability, not the mere possibility, of change. Although Mother indicates that some of the $75,000 she received could be used to care for the children upon her release, she "also testified that the $75,000 is now gone." Id. The juvenile court further found that "Father and Mother did not have employment throughout the case." Mother's App. p. 65. Given this history, the juvenile court could conclude that there is a reasonable probability that Mother will lack the resources to support her children upon her release. Furthermore, Mother's failure to provide basic care, including bathing her children, maintaining a clean and safe environment, and providing prescribed medication, had little to do with lack of finances.

Although Mother places blame for the meth lab primarily upon Father, she admits to also having participated in the crime. Indeed, she pleaded guilty to it. The juvenile court also had evidence before it that this was not a one-time occurrence. Mother testified that meth had been manufactured in the home on at least two occasions, and a report by the GAL indicated that a detective investigating the scene found 15-20 other spent meth labs—the detective also stated that the home contained the worst lab he had ever investigated. Tr. p. 189; Mother's App. p. 56-57. Mother did not even bother to remove the children from the home while such a dangerous activity was taking place. Furthermore, although Mother argues that Father bears primary responsibility, when asked about the future, "Mother testified that if they decided to get an apartment, then yes

he would be welcome back unless he had some type of drug problem . . ." Mother's Br. p. 19. Given this testimony, the court could conclude that there was a reasonable probability that the manufacture of methamphetamine would continue in the home upon Mother's release.

## B. Father

The juvenile court's order terminating Mother and Father's parental rights contained thirty-six findings of fact. Father's App. p. 21. Father argues that several of these findings are not supported by the evidence. The following are among the findings we consider most relevant to the juvenile court's ultimate determination:

10. On or about January 1, 2013, . . . Children were found in the home of the family with an active Methamphetamine Lab.

17. On or about February 26, 2013, both Father and Mother [pleaded guilty] to Dealing in Methamphetamine, and two counts of Neglect of a Dependent Child.

18. On March 26, 2013, both Father and Mother were sentenced to 18 years with 3 years suspended (serve 15 years).[2]

19. Prior to January 1, 2013, Parents never followed through with any service providers. Parents did not follow service provider recommendations. Father and Mother did not show that they could maintain a safe and secure environment for the Child. Father and Mother's home was condemned due to the Manufacturing of Methamphetamine in the home, while children were present.

---

[2] Although this finding is erroneous, Father does not challenge it. Father was sentenced to twelve years executed and three years of probation. Father's Br. p. 6. Other than this misstatement, nothing in the record indicates that the juvenile court was mistaken as to how long Father was to be incarcerated or that it relied on a mistaken belief as to this fact in reaching its ultimate judgment. FCM Hernandez testified that her recommendation was based, in part, upon the understanding that Mother and Father would both serve a minimum of six years in prison. Tr. p. 100.

10

30. Prior to January 1, 2013, Father and Mother were provided services to assist in parenting their children but never took advantage of these services.

31. Father and Mother did not have employment throughout the case.

32. No service provider was able to recommend that Father and Mother be reunified with Children. Father and Mother failed to improve their parenting abilities and demonstrate they were able to probably [sic] care for Child; and because they failed or refused to follow through with services and appointments, thereby limiting the service provider's ability to make an informed decision as to Father and Mother.

33. Based on Father and Mother's lack of progress and their refusal or inability to improve their ability to provide proper care and nurturing for the Children and due to Father and Mother's incarceration for 18 years, DCS Family Case Manager, Karena Hernandez, testified that adoption and termination of parental rights was in the Child's best interest.

Father's App. p. 22-23. Father does not challenge findings 10 and 17, regarding the meth lab, finding 31, regarding his lack of employment, or finding 33, regarding the FCM's recommendation.

Father first challenges finding 19, regarding Father's lack of communication with service providers. Father argues that "no service provider ever testified that parents never followed through or made appointments." Father's Br. p. 13. While Father's statement may be technically correct—at one point Mother did make an appointment with a parenting counselor—the finding, when viewed in light of the totality of the circumstances, is essentially correct. The counselor testified about her attempts to

11

contact Mother and Father after she had first called unsuccessfully and then stopped by the house and left her card:

Q:      Okay. And did they return a phone call from your card?
A:      They did not.
Q:      Did they stop by the office?
A:      They did not.
Q:      What steps did you take after that then?
A:      I dropped by several more times and kept leaving cards. Um, eventually I did get a call from [Mother]. . . . We did set up an appointment. Um, she called that day to cancel the appointment and then I came out to the home and no one was there when I showed up . . . .
Q:      So you showed up the day that the appointment had be . . .
A:      Had been rescheduled.
                         . . .
Q:      So you never actually met with the parents or provided them with any services.
A:      I did not.

Tr. p. 139-40. Thus, although Mother did at one time make an appointment, she immediately cancelled and failed to attend the rescheduled appointment. The trial court was correct to find that neither Mother nor Father "followed through" with these appointments in any ordinary sense of the phrase. Father's Br. p. 13.

Father also takes issue with finding 30, regarding his failure to take advantage of the services offered. Father argues that "[no] service provider testified that Father and Mother never took advantage of services that were offered." Father's Br. p. 15. As evidenced by the above-quoted testimony, this argument is simply false. Father further argues that J.H. had been making progress with a physical therapist prior to January 1, 2013. While he may be correct—a physical therapist from the First Steps Program of

12

Indiana had been meeting with J.H. from August to December of 2012, Tr. p. 34—this was not a court-ordered service. Even assuming, for the sake of argument, that the juvenile court's finding was meant to refer to more than court-ordered services, the alleged error is minor when viewed in light of the totality of the circumstances.

Finally, Father takes issue with finding 32, in which the juvenile court notes that no service provider was able to recommend reunification. Father is correct that only one service provider, FCM Hernandez, was asked to give a recommendation. However this was because Father failed to meet or even make contact with any other service provider. Father further argues that "[n]othing in the evidence proves that, given time, Father and Mother could not have made sufficient improvements." Father's Br. p. 15. However, as the same will be true in nearly every case involving the potential termination of parental rights, the juvenile court does not look to the possibility of change, but rather, the probability of change. In re A.B., 924 N.E.2d at 670.

Father presents no challenge that calls into question the actual substance of the juvenile court's findings. These findings are supported by the evidence and they support the conclusion that there is a reasonable probability that the conditions which led to the removal of the children will not be remedied. As we have determined that the juvenile court was correct in this determination, we need not consider whether it was also correct in its determination that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the children. B.H. v. Ind. Dep't of Child Servs., 989 N.E.2d 355, 364 (Ind. Ct. App. 2013).

13

## II.  The Best Interests of the Children

Both Mother and Father argue that DCS failed to prove by clear and convincing evidence that termination of the parent-child relationship is in the best interests of the children.  I.C. § 31-35-2-4(b)(2)(C).  In this instance, both the FCM and GAL recommended terminating the parent-child relationship.  "[W]e have previously held that the recommendations of the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests."  In re I.A., 903 N.E.2d 146, 155 (Ind. Ct. App. 2009).  We could therefore end our analysis here.

However, we wish to address Mother's argument that this case is similar to In re G.Y., 904 N.E.2d 1257 (Ind. 2009).  In that case, our Supreme Court held that termination of the parent-child relationship between a mother and her son was not in the best interests of the child where the mother had committed a crime prior to her son's birth for which she was incarcerated when he was twenty months old.  The Court noted that "Mother had been G.Y.'s sole caretaker during the first 20 months of his life and there are no allegations that she engaged in any criminal behavior during this period of time or that she was an unfit parent in any way."  Id. at 1258.

This case is clearly distinguishable.  Here, both Mother and Father have engaged in criminal activity, not only during the children's lifetimes, but in the presence of the children.  Furthermore, the nature of the crimes committed is markedly different.  In

14

G.Y., the mother was incarcerated for delivering cocaine to a police informant. While this is certainly a serious offense, in the context of determining whether parental rights should be terminated, it is not comparable to cooking methamphetamine, a notoriously dangerous activity, in the presence of one's children. In G.Y., our Supreme Court gave prominence to the fact that, from the moment her son was born, "the record [gave] no indication that Mother was anything but a fit parent." Id. at 1262. Such is not the case here.

Furthermore, the Court in G.Y. recognized that "[p]ermanency is a central consideration in determining the best interests of the child." Id. at 1265. However, the Court went on to note that G.Y.'s "Mother's release from prison [was] imminent" before concluding that "G.Y.'s need for immediate permanency through adoption . . . either alone or in conjunction with the court's other reasons," did not warrant the conclusion that termination of the mother's parental rights was in G.Y.'s best interests. Id. at 1265-66.

In this case, we find otherwise. Initially, we note that neither Mother nor Father's release from prison can be considered "imminent." Mother was sentenced to a twelve-year executed sentence but notes that she anticipates being released in July 2018. Mother's Br. p. 25. Similarly, it appears that Father's earliest release date is in January 2019. Father's App. p. 41. Thus, at the time of Mother's earliest release, D.H., who was removed from Mother and Father's care when he was eleven months old, will be six years old, and J.H., who was removed when she was twenty-three months old, will be

15

seven years old. By that time, the children will have spent the vast majority of their lives with their adoptive family, and these years will have been some of their most formative.[3] Under these circumstances, the children's need for stability and permanence counsels strongly in favor of finding that adoption is in their best interests. Therefore, we find that the length of Mother and Father's prison terms, in conjunction with the other evidence before the juvenile court, proved clearly and convincingly that termination of the parent-child relationship is in the best interests of the children.

Mother also alleges that DCS has failed to prove clearly and convincingly that there is a satisfactory plan for the care and treatment of the children. DCS' plan for the children is that they be adopted by their current foster parents. Tr. p 98-99. This Court has previously held that "[f]or a plan to be 'satisfactory,' for purposes of the statute, it need not be detailed, so long as if offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." Lang v. Starke Cnty. Office of Family & Children, 861 N.E.2d 366, 374 (Ind. Ct. App. 2007) (quotations omitted). Adoption has been found satisfactory even in cases in which the adoptive parents are not known at the time of termination. Id. In this case, the FCM testified that the children have bonded with their pre-adoptive parents, with whom they have now

---

[3] Compare this case to H.G. v. Indiana Department of Child Services, 959 N.E.2d 272 (Ind. Ct. App. 2011). In that case, this Court determined that termination was not in the children's best interests where the mother had been incarcerated for stealing items from a house she had been hired to clean, her children were twelve, nine, and eight years old at the time of their removal, and mother's earliest release date was about two and one-half years after her children's removal. Here, the nature of the crime, age of the children, and length of the prison terms support the opposite conclusion.

16

spent the majority of their young lives. Tr. p. 100. Mother provides no explanation as to why the plan at issue here is not satisfactory.

The judgment of the juvenile court is affirmed.

MAY, J., and BARNES, J., concur.