## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 31 2018, 9:16 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Erin L. Berger
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of A.L., C.L., E.L., M.L., and J.P. (Minor Children) and N.L. (Mother)

N.L. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

December 31, 2018

Court of Appeals Case No.
18A-JT-1540

Appeal from the Vanderburgh Superior Court

The Honorable Brett J. Niemeier, Judge

The Honorable Renee A. Ferguson, Magistrate

Trial Court Cause No.
82D04-1703-JT-516
82D04-1703-JT-517
82D04-1703-JT-518
82D04-1703-JT-519
82D04-1703-JT-520

**Vaidik, Chief Judge.**

# Case Summary

N.L. ("Mother") appeals the termination of her parental rights to her five children.  We affirm.

# Facts and Procedural History

Mother is the natural mother of five children: J.P., born in 2006; M.L., born in 2007; C.L., born in 2008; A.L., born in 2010; and E.L., born in 2013 (collectively, "Children").  A.P. is the natural father of J.P., and K.L. ("Father") is the natural father of the four youngest children.[1]  The facts that follow are taken primarily from the trial court's findings of fact, none of which Mother challenges on appeal.[2]

In November 2014, the Department of Child Services (DCS) received a report that Mother and Father (collectively, "Parents") were "using methamphetamine and sleeping on a porch."  Tr. Vol. II pp. 240-41.  DCS conducted an assessment, and Parents tested negative for drugs.  While the first assessment was still open, DCS received two more reports involving violence

---

[1] The trial court also terminated A.P.'s and Father's parental rights, but neither is involved in this appeal.

[2] Because Mother does not challenge the trial court's findings of fact, we accept them as true.  *See Maldem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) ("Because Maldem does not challenge the findings of the trial court, they must be accepted as true.").

and abuse. The first report alleged that Mother tried to stab Father with a knife during a domestic-violence incident. Mother "denied that there was a knife involved" but admitted there was an "incident." *Id.* at 243. The second report alleged that Father physically abused J.P. by pushing "him in a door sill when he got in trouble." *Id.* at 244. In December, DCS substantiated all three reports and filed petitions alleging that Children were Children in Need of Services (CHINS). Children remained in Parents' home, and the trial court set a fact-finding hearing for April 2015.

[4]     In March 2015, before the fact-finding hearing, DCS received a report that Father beat M.L. with a cutting board and a belt and had been arrested on child-abuse charges. Family Case Manager (FCM) Ellen Moore visited Parents' house and saw that M.L. had marks and bruises on his face, shoulders, and buttocks. FCM Moore also noticed that Parents' house was filthy—Children's mattresses were soaked in urine, there were no clean clothes, and no personal hygiene products could be found in the house. FCM Moore told Mother that E.L. along with all her other children needed to be taken to the emergency room for evaluation. Mother took E.L. to the emergency room but did not take any of her other children. Thereafter, Children were removed from Mother's care because she did not take all her children to the emergency room or seek any other medical attention. In April 2015, the trial court adjudicated Children CHINS and entered a dispositional order requiring Mother to cooperate with in-home therapy, submit to random drug screens, engage in supervised visitation services, enroll in the YMCA domestic-violence program,

and remain drug and alcohol free. The trial court also ordered that Father was not allowed to have contact with Children.

[5] In September 2015, the trial court ordered Mother to work with a parent aide for ninety days and participate in daily drop-ins for sixty days. The trial court also ordered that Children could begin a trial home visit with Mother. As soon as Children were placed back with Mother, issues arose. By the end of 2015, Mother was unemployed, the dirty and unsafe living conditions of her house had not improved, Mother was behind on rent, Children were dirty, and Mother failed to keep appointments for herself and Children. During this time, Mother also permitted Children to have contact with Father, in violation of the trial court's no-contact order.

[6] Throughout the first half of 2016, DCS continued to provide intensive services to Mother while Children were in her care. The parent aide worked with Mother through April 2016 and attempted to address Children's hygiene and the conditions in Mother's house. However, no progress was made. In fact, Children's school continually reported that Children were filthy, wore the same clothes day after day, and smelled of urine. By June 2016, FCM Moore restored daily drop-ins so that between all the various service providers, someone was checking on Children every day.

[7] Nonetheless, in August 2016, E.L. was found lethargic and unresponsive due to an overdose of a prescription sedative. At the time, Children were being cared for by their maternal grandfather (Grandfather) while Mother worked.

Sometime on the afternoon of August 9, Grandfather noticed that Children had gotten into some medication. He tried to contact Mother but was not able to reach her. When Mother got home from work, at approximately 5 p.m., E.L.'s eyes were closed, and he could barely hold his head up. Mother called an ambulance to come get E.L. FCM Moore arrived at Mother's house at the same time as the ambulance. FCM Moore had come to bring Children new mattresses as Mother still had them sleeping on urine-stained mattresses. When she entered Mother's house, FCM Moore noticed that two other children were lethargic. Ultimately it was discovered that three of the five children had ingested the sedative and had to be hospitalized. The next day, Children were removed from Mother's care.

[8] In March 2017, DCS filed petitions to terminate Mother's parental rights to Children. Over the course of five days (June 19, June 27, July 31, August 7, and August 25) the trial court held the fact-finding hearing. The trial court heard the testimony of twenty-six witnesses who were closely involved with Children and/or Mother, including multiple FCMs, teachers, school counselors, individual counselors, therapists, and medical professionals. At the end of the hearing, Mother's attorney requested a continuance so that Mother could call two additional witnesses—her father, i.e., Grandfather, and her therapist, Melanie Menser. Mother's attorney alleged that Grandfather was unavailable that day because he had a "heart doctor's appointment" and that Menser was unavailable that day because the subpoena that was sent to her had the wrong date on it. Tr. Vol. V p. 11. The trial court denied Mother's request

for a continuance and ordered that "the testimony and evidence for this trial is closed." *Id.* at 13. The trial court issued an order terminating Mother's parental rights in December 2017. The order provides, in relevant part:

> [A]16. Any progress with [Mother] and her abilities to meet the basic needs of [Children] and provide a safe, stable environment was slow and slight, and did not prove to be sustainable. [Mother's] non-compliance with services was ongoing and well established by witnesses from Southwestern Behavioral health, Ireland home based Services, First Steps representatives, current FCM's and former FCM's.

> *****

> [B]11. The Court finds that while in [Mother's] care, [Children] ha[ve] been subjected to life and health endangering environments as evidenced by physical abuse, domestic violence, [Children] having access to prescription medication, the poor home conditions and the poor hygiene of [Children].

> *****

> [B]16. During the pendency of the underlying CHINS matter, [Mother] was not consistently employed, was unable to maintain sufficient food in the home, clothing or attention to hygiene. [Mother] testified that as of the last day of her Termination of Parental Rights hearing, she was behind on rent, had no money, confirmed she posted on social media the day prior asking friends [to] give her money to pay rent because she was behind and "Broke". [Mother] has clearly not improved her ability to provide necessary food, shelter, clothing, support or any sort of stability for [Children.]

[B]17. [Mother] has raised [Children] in a dangerous, harmful environment fraught with aggression, domestic violence, intimidation, neglect, and physical and emotional abuse. [Mother] has not been able to acknowledge any of her flaws or shortcomings as a parent and certainly has not remedied the reasons for [Children's] removal, and the Court finds there is a reasonable probability that continuation of the parent child relationship with [Mother] poses a threat to the well-being of [Children].

[B]18. This judicial officer has presided over [Mother's] previous CHINS cases as well as this instant case. The Court finds this situation to be literally hopeless. In observing [Mother] over these years, there has been no maturation of [Mother] as a parent. In observing and listening to [Mother], the Court finds that she is lacking in the ability to understand [Children's] emotional, mental, and physical needs. [Mother] reacts with anger and resentment toward [Children] rather than insight and nurturing. A continued relationship between [Mother] and [Children] will be devasting and cause irreparable mental and emotional damage to [Children].

*****

[C]4. DCS, the Court Appointed Special Advocate (CASA), and the witnesses involved all believe that adoption is in [Children's] best interest. The Court finds that adoption is in [Children's] best interest.

[C]5. Mother's habitual pattern of verbal abuse towards [Children], habitual pattern of failing to provide for the basic need[s] of [Children], lack of employment, inattention to medical, dental and health needs and total instability indicates that maintaining a parent-child relationship with [Children] is not in the best interests of [Children].

Appellant's App. Vol. II pp. 45-51.

[9]     In January 2018, Mother filed her notice of appeal in appellate cause number 18A-JT-94. In her initial appeal, Mother argued that the trial court violated her due-process rights when it denied her a continuance to call two additional witnesses. In April 2018, DCS filed a motion for stay and remand to permit Mother to call her two additional witnesses. In May 2018, this Court granted DCS's motion and ordered in relevant part:

> 2. This appeal is dismissed without prejudice and remanded to the trial court with instructions that the trial court hold an evidentiary hearing within thirty (30) days of the date of this order so that Appellant may present her last two witnesses and so that the trial court may weigh said testimony and issue a new order in the underlying termination of parental rights case.

*Id.* at 54. On June 8, the trial court heard testimony from Grandfather. After he testified, Mother's attorney requested that the court order DCS to contribute to the fees associated with Mother's final witness, her therapist, Melanie Menser. Mother's attorney argued that Menser was a service provider appointed by DCS and was "initially listed on the witness list" for DCS, but they chose not to call her. Tr. Vol. V p. 33. The trial court denied Mother's request and stated, "It's your client's witness so she'll be responsible for that witness['s] time in Court." *Id.* Thereafter, on June 12, the trial court heard testimony from Melanie Menser. Menser was a licensed social worker who provided individual therapy to Mother. She observed half-a-dozen visitations with Mother and Children and stated that the "interactions would be stressed"

and that on "at least two occasions" Mother and Children had to be "separated to lower the distress and try to come back together." *Id.* at 39-40. Menser provided services to only Mother and stated that she did see "moderate to significant progress" in individual treatment. *Id.* at 43. Menser could not testify "to services about the kiddos" and said that she referred Mother to group therapy in October 2017, but Mother "did not show" for group therapy so she closed Mother's case. *Id.* at 47.

[10] After Menser testified, the trial court took a brief recess. Upon return, the trial court issued an order terminating Mother's parental rights. The order provides, in relevant part:

> The Court after hearing and taking into consideration the testimony of [M]other's two additional witnesses now finds that the Court's prior ruling remains unaltered.

Appellant's App. Vol. II p. 13; *see also id.* at 14-17.

[11] Mother now appeals.

# Discussion and Decision

[12] Mother makes three arguments on appeal. First, Mother argues that the trial court's termination order does not comply with Indiana Code section 31-35-2-8. Second, Mother contends that the trial court failed to consider Menser's testimony. Third, Mother asserts that the trial court erred by not ordering DCS to pay for Menser's testimony.

# I. Second Termination Order

First, Mother argues that the trial court's second termination order does not comply with Indiana Code section 31-35-2-8 because the order "makes no findings or conclusions based upon the evidence that was presented at the fact-finding hearing." Appellant's Br. p. 13.

The termination of parental rights is controlled by Indiana Code section 31-35-2-4(b)(2), which provides that a petition must allege, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d 1225, 1231 (Ind. 2013). If the court finds that the

allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a). If the court does not find that the allegations in the petition are true, it shall dismiss the petition. *Id.* at (b). Indiana Code section 31-35-2-8(c) provides that the trial court "**shall** enter findings that support the entry of the conclusions required by subsection (a) and (b)" to either terminate a parent-child relationship or to dismiss the termination petition. (Emphasis added).

[15] When a trial court has entered findings of fact and conclusions, we will not set aside the trial court's findings or judgment unless clearly erroneous. *K.T.K.*, 989 N.E.2d at 1229. To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016). This means that the trial court's findings of fact and conclusions of law are crucial to our review. *In re N.G.*, 61 N.E.3d 1263, 1265 (Ind. Ct. App. 2016). However, where the findings of fact and conclusions of law are sparse or improperly stated and do not adequately address each of the requirements of the termination statute, we cannot conduct an adequate review. *Id.*

[16] Here, the trial court's first termination order comprised twelve pages of specific findings of fact and conclusions of law that made clear why the court was terminating Mother's parental rights. Mother appealed, and this Court remanded to the trial court so that Mother could present her last two witnesses.

After Mother presented those two witnesses, the trial court issued a second termination order, stating, in relevant part:

> The Court after hearing and taking into consideration the testimony of [M]other's two additional witnesses now finds **that the Court's prior ruling remains unaltered**.

Appellant's App. Vol. II p. 13 (emphasis added). In other words, Mother's last two witnesses did nothing to change the trial court's mind and therefore the trial court's second order simply incorporated its first order. Because the second order incorporates the first order—which contains ample findings of fact and conclusions of law upon which we could conduct an adequate review—we conclude that the second termination order complies with Indiana Code section 31-35-2-8.

## II. Weight of Menser's Testimony

[17] Next, Mother asserts that the trial court failed "to consider" and gave "no weight" to Menser's testimony. *See* Appellant's Br. p. 13. To the extent that Mother alleges that the trial court did not consider Menser's testimony, she is incorrect. On remand, "after **hearing and taking into consideration** the testimony of [M]other's two additional witness," the trial court terminated Mother's parental rights. Appellant's App. Vol. II p. 13 (emphasis added). To the extent that Mother argues that the trial court should have given Menser's testimony more weight because her testimony "refutes the findings made by the court"—that is a request for us to reweigh the evidence. When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness

credibility. *K.T.K.*, 989 N.E.2d at 1229. Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* We do not reweigh the evidence on appeal and therefore see no error in the trial court's consideration of Menser's testimony.

## III. Cost of Menser's Testimony

[18] Last, Mother contends that the trial court erred by "refusing to order DCS to pay for the testimony" of Menser—who Mother believes was an expert— because her testimony "was necessary in presenting an adequate defense." Appellant's Br. pp. 18-19. To the extent Mother asserts this would be a basis for reversing the termination order, we disagree. Notwithstanding the trial court's decision about fees, Menser ultimately testified. As such, the decision about fees had no impact on the merits of the case.

[19] In any event, the trial court did not err by declining to order DCS to pay for Menser's testimony. Decisions about expert services for indigent defendants are left to the trial court, and these decisions are not overturned absent an abuse of discretion. *Scott v. State*, 593 N.E.2d 198, 200 (Ind. 1992). The trial court is not required to appoint at public expense any expert the defendant believes may be helpful. *Id.* The defendant requesting the appointment of an expert bears the burden of demonstrating the need for the appointment. *Id.* A defendant cannot simply make a blanket statement that he needs an expert without some specific showing of what that expert would provide for the defendant. *Id.* While Indiana Code section 25-23.6-4-6 generally prohibits a licensed social worker

from offering expert testimony, it does not prevent a trial court from qualifying a social worker as an expert witness under Indiana Evidence Rule 702. *See B.H. v. Ind. Dep't. of Child Servs.*, 989 N.E.2d 355, 361 (Ind. Ct. App. 2013).

[20] Here, Mother believes that Menser was an expert witness and therefore the trial court should have appointed her at public expense. However, Mother's argument fails at the outset because Menser was not an expert witness. As the State correctly points out, "Mother did not seek Menser to be qualified as an expert, nor did the court do so during trial." Appellee's Br. p. 33. Furthermore, the record shows that Menser provided factual testimony, not expert testimony. Because only experts are appointed at public expense and Menser was not an expert, the trial court did not err by declining to order DCS to pay for Menser's testimony.

[21] Affirmed.

Mathias, J., and Crone, J., concur.