# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 30 2020, 9:06 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Helen L. Newman
J. Everett Newman III
Albion, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

In the Termination of Parent-Child Relationship of:

J.I. & K.I. (Minor Children)

and

B.W. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

January 30, 2020

Court of Appeals Case No.
19A-JT-1773

Appeal from the
Kosciusko Superior Court

The Honorable
David C. Cates, Judge

Trial Court Cause Nos.
43D01-1901-JT-20, 43D01-1901-JT-21

**Altice, Judge.**

## Case Summary

B.W. (Mother) appeals from the involuntary termination of her parental rights to her two minor children, J.I. and K.I. (collectively, the Children). She challenges the sufficiency of the evidence supporting the termination order.[1]

We affirm.

## Facts & Procedural History

Mother and B.I. (Father) are the biological parents of brothers J.I. and K.I. born in 2009 and 2013, respectively. On February 7, 2017, DCS received a report of neglect of the Children, who were residing with Mother, stating that Mother was using illegal drugs, had outstanding arrest warrants, and had left the Children with a friend stating that she "was not sure" how long she would be gone. *Appellant's Appendix Vol. II* at 198. J.I. had told the reporting source that Mother was smoking a white substance in a glass pipe "every day," and Mother punches the Children when she gets mad. *Id.* at 72.

The Children were placed with Father, but he returned them to Mother's home on February 12. After receiving a call that the Children were back with Mother, DCS, on February 13, visited Mother's home, along with a law enforcement officer due to the outstanding warrants. J.I. told DCS that Mother kept a glass smoking device and "whitish-orange powder" in a bag in her

---

[1] Father's parental rights also were terminated but he does not participate in this appeal. Accordingly, we will focus on the facts related to Mother.

bedroom. *Id.* at 199. DCS asked to drug screen Mother and she refused. Mother was arrested, and the Children were removed to protective custody. The next day, DCS filed a Child in Need of Services (CHINS) petition. In March 2017, the court appointed CASA Brian Erne.

[5] The Children returned to reside with Father, but, on April 25, 2017, DCS removed them from Father "due to the lack of stability and safety for the [C]hildren," including concerns of drug use and or dealing. *Id.* After removal from Father's care in April 2017, the Children were placed with Jerry and Linda Lowery (the Lowerys),[2] where they remained until July 3, 2018.

[6] On May 24, 2017, Mother admitted that she was unable to provide the Children with care or supervision due to her incarceration after pleading guilty to disorderly conduct and theft, and the court adjudicated them CHINS. Following a June 27, 2017 hearing, the trial court issued a dispositional order on July 17 that required Mother, among other things, to enroll and participate in program(s) recommended by DCS, keep appointments, not use any illegal controlled substances, complete a parenting assessment and a substance abuse assessment and associated recommendations, maintain housing and a source of income, and submit to random drug screens. Placement of the Children continued with DCS.

---

[2] The record reflects that the Lowerys were, or at one time had been, neighbors to Mother and had previously provided care to the Children at various times. *Appellant's Brief* at 6; *Appellant's Appendix Vol. II* at 141.

[7]     On August 27, 2017, Mother was released from incarceration. After her release, Mother was "transient" and, by September 28, 2017, had not obtained a job, was "a no-show" at two visits, had not complied with required assessments, and "continues to expect special accommodations to be made for her" with regard to visitation. *Id*. at 143. The Children were in compliance with services and were reported as "thriving in their placement" and "doing well in their educational pursuits." *Id*.

[8]     Several months later, on November 29, 2017, CASA Erne submitted a report indicating that Mother had not completed a parenting assessment or substance abuse assessment, not kept appointments with him, DCS, or the Bowen Center. Mother visited with Children on the day of her release and had been ordered to have supervised visits with them every other week, but failed to attend "any of these visitations and they have now been suspended." *Id*. at 140. CASA Erne reported that Mother had "done nothing to fulfill [her] dispositional obligations." *Id*. at 141. CASA Erne also reported having met with the Lowerys on several occasions. He observed that the Children appeared comfortable and happy in the home and had shown improvement in their emotional well-being. J.I.'s teachers commented that his attitude was more positive since being with Lowerys.

[9]     On February 19, 2018, the court issued an order finding that "Mother has participated in some services, but has not fully engaged in those services or complied with all the resulting services and/or recommendations." *Id*. at 134-35. The Children were still in placement and "progressing well." *Id*. at 134.

[10] On June 27, 2018, Mother filed a Motion for a Trial Home Visit (THV). One month later, DCS by Family Case Manager (FCM) Jeffrey Bryant filed a progress report. FCM Bryant stated that on July 3, when he explained to the Lowerys that DCS had a responsibility to work toward reunification with Mother, Mrs. Lowery expressed frustration with the system and an inability to continue with DCS if the Children would be "inevitably" returned to Mother, who the Lowerys believed "did not have the ability to be a good mother." *Id.* at 126. Thereafter, FCM Bryant transported the Children to a licensed foster residence. FCM Bryant reported that the Children were happy in the new placement with the exception of dealing with the emotional trauma of another removal in less than two years. FCM Bryant also reported that "[w]hile there was a significant delay in her beginning services, [Mother] has been fully compliant in the last couple months, and has made important strides." *Id.* at 128. He stated that although DCS did not at that time have any safety concerns, "[t]here are some concerns of long-term stability and well-being" of the Children, but that DCS believed "these concerns can be alleviated through home-based services during the course of a Trial Home Visit." *Id.*

[11] On August 3, 2018, CASA Erne reported that the Children were having twice-weekly supervised visits with Mother in preparation for the THV. Mother advised CASA Erne that she had obtained an assessment at Bowen Center but did not engage in services there because she felt uncomfortable with the group leader and instead sought services on her own through a different program. CASA Erne reported that Mother had obtained appropriate housing and that

she was not employed but was receiving disability income. Mother was attending individual counseling sessions and had begun receiving Homebuilders' services in mid-July 2018. CASA Erne believed that a six-month THV would be appropriate so long as "continued services through Bowen and Lifeline such as Homebuilder's and [Family Centered Treatment]" were in place. *Id*. at 120.

[12] On August 6, 2018, the trial court issued an order on periodic review, finding that Mother "has been working towards completing services on a consistent basis," has visited the children, cooperated with DCS, enhanced her ability to fulfill her parental obligations, and "the cause of the out-of-home placement or supervision has been alleviated." *Id*. at 113-114. The court granted the request for THV "subject to the requirement that [Mother] complete Intensive Home-Based services, as recommended by DCS and its providers[,]" and the Children were placed with Mother. *Id*. at 114.

[13] Mother submitted to a drug screen on October 9 and it was negative. At a team meeting on October 31, 2018, Mother refused to screen. She submitted to a screen on November 8, which was found positive for methamphetamine. On November 13, 2018, DCS filed a request to end the THV and take the Children into custody stating it was in their best interest to remove them from Mother's home environment. In support, DCS submitted the affidavit of FCM Rachel Merriman who averred that (1) Mother was noncompliant with home-based therapy which was cancelled by the provider, (2) DCS had received reports with concerns of drug use by Mother, (3) Mother refused screens on September 25

and November 13, had a negative screen on October 9, and a failed screen on November 8.

[14] The next day, CASA Erne filed a report stating that, in the fall of 2018 and since being placed with Mother, J.I. had experienced multiple behavioral problems, was disruptive in class, showed aggression to other students, and failed to follow teacher instruction. The school counselor, Cindy Brady, expressed concern with "the decline in [J.I.]'s emotional well being since the last school year." *Id*. at 102. K.I., who was then in kindergarten, had exhibited behavior problems in school and on the bus and interfered with other children in and out of the classroom. While visiting with the Children, CASA Erne had observed a change in their demeanor during the period of the THV, describing J.I. as distant and depressed and K.I. looking unhappy and distracted. K.I. would lose his temper easily. CASA Erne found the change in attitude and behavior to be "marked and disturbing." *Id*. at 103.

[15] CASA Erne stated that when THV began, the family had been ordered to participate in Family Centered Treatment (FCT), intensive in-home family therapy, through Lifeline, but in mid-September Lifeline reported that there had been missed appointments and no progress, and when cancellations continued, Lifeline discontinued FCT. J.I. was receiving individual therapy from Bowen once per week, which increased to twice per week. K.I. had not been ordered to receive individual services, but when CASA Erne suggested it, Mother expressed disapproval, stating that her negative feelings toward therapy stemmed from her having personally received services and "they didn't do . . .

any good." *Id*. at 103. Eventually, Mother agreed that K.I. could begin with services with Bowen twice per week.

[16]  CASA Erne noted that during his visits, Mother would stay in her room, say she was not feeling well, or send the boys fishing with him. Mother expressed to CASA Erne in October 2018 that she did not find anything wrong with the boys' behavior, expressed her belief that everyone was against her, and that she wanted to move out of state. CASA Erne opined that Mother "has been unwilling to accept the help being offered to her boys and herself" and "has demonstrated a consistent lack of engagement[.]" *Id*. at 107. CASA Erne believed that having the Children "continuing to live in [Mother]'s care is unsafe and poses a substantial risk to their physical and emotional health" and for these reasons, his opinion was that it was in the Children's best interest to terminate the THV. *Id*. The Children were removed from Mother's care "due to noncompliance with the court orders of individual and family based therapy and a positive drug screen for methamphetamine," and placed with foster parents. *Id.* at 72-73.

[17]  On January 16, 2019, DCS filed a petition for termination of parental rights. In a February 1, 2019 permanency report, FCM Merriman stated that Mother had obtained secure housing, was not working but was receiving disability payments, had complied with some visits but had missed or canceled others, and had completed a mental health and substance abuse assessment on January 21, 2019, which recommended individual therapy and a parenting skills assessment. DCS had requested Mother to call in daily for screens, and Mother

started calling for two weeks, but stopped. DCS arranged a drug screen service to do the screens at Mother's home, and she was tested and passed several screens, but "that service was canceled due to noncompliance." *Id*. at 76. FMC Merriman opined that Mother had been "semi-compliant during this review period" but that she "is not in compliance" with the dispositional order and "has not enhanced [her] ability to fulfill [her] parental obligations." *Id*. at 76. FMC Merriman noted in the report that the staff at the Children's school had "noticed a . . . change in behavior now that the boys have left THV and returned to foster care" such that they "are performing better in all areas behavior and educationally" and describing them as "happy, healthy and active." *Id*. at 73. The report indicated that DCS had been in contact with the Lowerys who stated that if termination of parental rights would occur, they would be "more tha[n] willing to take the boys back." *Id*. at 72.

[18] On February 8, 2019, CASA Erne filed a report, stating that when THV was terminated in November 2018, the school noticed improvements in the Children's behavior and attitude. Brady, the school counselor, was "adamant" that the decline of the boys' emotional well-being and school performance was mother's influence. *Id*. at 68. CASA Erne stated that Mother did not participate in services in October, November, or December 2018. She was reassessed on January 21, 2019, as ordered, but had not started services or counseling as recommended. Mother had been directed to call in daily for random drug screens through Redwood Toxicology who agreed to come to Mother's residence to administer the screens; Redwood made six attempts

between November 30, 2018 and January 3, 2019; Mother was not at home on three occasions and she refused on three occasions, and Redwood suspended services.

[19] CASA Erne reported that Mother was to have once-a-week supervised visits after the THV ended, but she was "often late" and would become frustrated with the Children's behavior and sometimes call them names. *Id*. at 66. The foster parents reported to the CASA that they observed a regression in behaviors following the Children's visits with Mother, and they requested that the visits be reduced. CASA Erne stated in his report that the Children were more stable and happy out of Mother's care, and he believed "it is time" to terminate Mother's rights. *Id* at 68.

[20] On February 27, DCS filed an addendum to the permanency report, advising the court that, during February 2019, Mother attended half of her scheduled visits and did not call to cancel missed visits, and while the boys interact well with Mother when she comes, they "are not surprised when mom does not show up." *Id*. at 61. With regard to Mother's recommended therapy, Mother had missed all individual therapy sessions. Mother had a positive methamphetamine screen on February 12, 2019, when she overdosed on antidepressants and was taken to the hospital. Thereafter, Mother was an inpatient at Bowen February 15-18, and, after her release, she missed visits with Children without explanation. Mother refused to share the medical records with DCS telling FCM Merriman that the records were "none of [her] business." *Id*. at 63.

[21] The trial court held factfinding hearings, which began and were continued due to time constraints, on April 15, June 10, and June 26, 2019. DCS presented the testimony of, among others, DCS supervisor Lindsay Castro, FCM Merriman, CASA Erne, DCS service manager at the Bowen Center Conner Gannon, Mrs. Lowery, and a foster parent with whom the Children were placed after THV. FCM Merriman's testimony included her opinion that Mother had not remedied the reasons for the Children's removal and that termination was in the Children's best interests. CASA Erne testified that he believed it was "detrimental" to the Children to be in Mother's presence, and he recommended termination of parental rights and adoption by the Lowerys. *Transcript* at 155. Mrs. Lowery stated that if termination was granted, she and her husband wanted to adopt the Children.

[22] Mother testified to steps she had taken on her own accord, such as starting to attend a program in the spring 2019 called Clean Slate, which required drug screens and individual therapy, in order to address her growing dependency on Oxycontin that Mother was taking for pain associated with liver failure. She testified to being very uncomfortable with Bowen Center visitation facilitator, Jessica Wilson, due in part to J.I.'s animosity toward Wilson, and her requests to Bowen for a different facilitator.

[23] Mother and DCS both presented testimony of Rebecca Shaffer, a clinical social worker at the Bowen Center. Shaffer testified that she conducted a court-ordered parenting assessment of Mother in January 2019, and she diagnosed Mother with amphetamine use disorder and issues with impulse control. She

also testified that in May 2019 Mother had provided her with a binder of past medical history which indicated that Mother had an IQ of 73 and previously had been diagnosed with panic attacks and agoraphobia. Mother also had trust issues stemming from trauma in her own childhood. Shaffer testified that Mother began attending individual therapy sessions in February 2019 and that, after some no-shows in February and March, Mother started attending consistently and that, as of June 2019, Mother had attended 12-14 sessions and had also completed a parenting questionnaire in June 2019. Shaffer acknowledged that the questionnaire was not the equivalent of a parenting assessment.

[24] On July 19, 2019, the trial court issued an order terminating Mother's parental rights. The detailed and lengthy Order included the following determinations:

> Throughout the entirety of this case, Mother has displayed a habitual pattern of a lack of compliance with Court ordered services, complete resistance to DCS involvement, and failure to show benefit from the services she has participated in.

> * * *

> [W]hile Mother [] participated in some services, she ha[s] not fully engaged nor followed all services or recommendations.

> * * *

> Prior to the commencement of the Trial Home Visit, Homebuilder's service was in place to prepare Mother and the Children for reunification[.] . . . Homebuilders was in the home

for approximately fifty-two days and a total of fifty-five hours. Homebuilders was the only service Mother has completed in the over two years of DCS involvement. However, at the conclusion of Homebuilder's service, the service provider recommended the continuation of case management, engagement with family centered therapy, individual therapy, and therapy with the children.

Family Centered Therapy began in the home on September 7, 2018. Mother informed the service provider she did not need therapy and only identified that she needed help with financial assistance. The Court credits the testimony of Kendra Howard, the home based therapist, that Mother was not open to additional services, did not want services, and Mother stated she did not need services. . . . The service provider was accommodating to Mother and permitted six to seven "no call-no shows" prior to canceling the service, despite their policy of permitting only-three "no call-no shows"; [a]ppointments were cancelled for a variety of reasons, inc1uding not wanting to meet, not wanting services at all, and not being home at the scheduled time of the meeting. The service was ultimately cancelled on October 24, 2018.

*Id*. at 17-18. The court continued with findings concerning Mother's refused, failed, and passed drug screens, stating that "from January [2019] to June 10, 2019, Mother completed six of the thirty-two screens that should have been completed." *Id*. at 20.

[25] The court also discussed Mother's continued "resistance to services" after the THV, including her failure to attend the required number of individual therapy sessions "despite multiple attempts by FCM Merriman, Bowen Case Manager Conner Cannon, and Mother's therapist Rebecca Shaffer, to engage Mother in

services, reminder of appointments, and moving service times to accommodate Mother's needs." *Id.* at 18. The court recognized that, since April 15, 2019, Mother had completed nine individual therapy sessions with Shaffer, and that Mother had provided Shaffer with a binder of information of IQ and past diagnoses, but that "Mother failed to provide this information [to DCS] in the two years of the case prior to termination proceedings." *Id.* at 19. The court found Mother's testimony regarding "lack of memory or understanding as self-serving and selective." *Id*. The court noted that visitation went from twice a week after the THV to once a week due to Mother's non-compliance in services and missed visitations. It determined that "[o]nly after the commencement of the Termination trial has Mother minimally begun to participate" and that "progress had not been made and was not likely in the areas of substance abuse and anger management." *Appellee's Appendix* at 12. The order indicated that "the former placement where the children were placed for fourteen months prior to the [THV] intends to adopt the [C]hildren", that being the Lowerys, and that both the FCM and CASA Erne stated that the Children thrived while in that placement. *Id.* at 13. The court granted DCS's petition to terminate Mother's parental rights, and she now appeals.

## Discussion & Decision

[26] When reviewing the termination of parental rights, we consider the evidence in the light most favorable to the prevailing party, and we will not reweigh the evidence or judge the credibility of the witnesses. *Matter of M.I.*, 127 N.E.3d 1168, 1170 (Ind. 2019). To prevail, the challenging party must show that the

court's decision is contrary to law, meaning that the probative evidence and reasonable inferences point unerringly to the opposite conclusion. *Id*. "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *In re E.M.*, 4 N.E.3d 636, 640 (Ind. 2014).

[27] It is well recognized that a parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016) (quotations omitted). Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id*.

## Due Process

[28] In challenging the trial court's findings and conclusions, Mother asserts that the trial court violated her due process rights when it "adopted the entirety of DCS's proposed termination order and findings of fact without any significant alteration[.]" *Appellant's Brief* at 5. Our Supreme Court has recognized that "'[i]t is not uncommon for a trial court to enter findings that are verbatim

reproductions of submissions by the prevailing party" and that "we do not prohibit the practice of adopting a party's proposed findings.'" *A.F. v. Marion Cty. Office of Family & Children*, 762 N.E.2d 1244, 1249 (Ind. Ct. App. 2002) (quoting *Wrinkles v. State*, 749 N.E.2d 1179, 1188 (Ind. 2001), *trans. denied*; *see also B.H. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 355, 365 n.7 (Ind. Ct. App. 2013). We note that, as Mother acknowledges, the trial court's order in this case contained "a few minor variations" or differences from DCS's proposed order, *Appellant's Brief* at 7, and this reinforces our confidence that the trial court carefully reviewed the proposed orders and delivered a considered decision. We find no due process violation. *See A.F.*, 762 N.E.2d at 1249 (finding that trial court's verbatim adoption of DCS's proposed findings of fact and conclusions of law was not clearly erroneous).

## Sufficiency of Evidence

[29] We next address the sufficiency of the trial court's findings and conclusions. Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:

>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B).  DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child.  I.C. § 31-35-2-4(b)(2)(C), (D).

[30]   On appeal, Mother asserts that DCS failed to present clear and convincing evidence that the conditions resulting in the Children's removal would not be remedied, the continuation of the parent-child relationship poses a threat to the Children's well-being, termination is in the best interests of the Children, and there is a satisfactory plan for their care and treatment following termination. We will address each of these in turn, as needed.

### a.  Remedying of Conditions

[31]   Mother first contends that DCS failed to present clear and convincing evidence that there is a reasonable probability that the conditions resulting in the Children's removal or continued placement outside the home will not be remedied, urging that the trial court relied "too heavily on the Mother's early lack of progress and too little on her close-to-success status as late as four months before the TPR case commenced." *Appellant's Brief* at 14.

[32] In deciding whether a reasonable probability exists that conditions will not be remedied, the trial court must judge a parent's fitness to care for her children at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the children. *Id*. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *In re L.S.*, 717 N.E.2d 204, 210 (Ind. Ct. App. 1999), *trans. denied, cert. denied* (2002). The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id*.

[33] Here, DCS was contacted in April 2017 by a source about Mother having outstanding arrest warrants, leaving the Children with a friend without specifying when she was coming back, and suspected drug use involving a glass pipe and white powdery substance that Mother kept in a bag in her room. She was arrested and incarcerated after pleading guilty to disorderly conduct and

theft, and the Children were adjudicated CHINS. After her release, Mother did not comply with services. The Children were thriving in their placement with the Lowerys until July 2018 when they were removed after the Lowerys decided that their personal beliefs were not consistent with DCS's required reunification efforts with Mother. Mother requested and DCS agreed to THV in August 2018, subject to Mother's compliance with and participation in therapy and services. While Mother completed the Homebuilders program, she failed to comply with the required intensive home-based therapy, and therapy services were terminated by the provider. DCS, CASA Erne, and school staff noticed a marked decline in the Children's emotional health and behaviors while living with Mother during the THV. During that time, Mother resisted services on the basis that she believed they were not necessary or helpful. She refused or avoided a number of drug screens, and she tested positive for methamphetamine in November 2018. The Children were placed with foster parents, and CASA Erne and the school staff noticed an improvement in the Children's emotional health from when they were living with Mother. Mother thereafter failed to submit to drug screens, even when DCS made arrangements for Mother to be screened at her home. Mother overdosed in February 2019, and was an inpatient for several days at Bowen, but she thereafter missed visits with her Children. The visits with Children were reduced for noncompliance.

[34] Mother states that after she tested positive for methamphetamine "the whole focus by DCS shifted" and argues that up until that time, "the focus had been on a safe and secure home, not drug use." *Appellant's Brief* at 19. To the extent

that she is suggesting DCS could not focus on drug use because it allegedly had not done so prior to her positive screen, we reject that argument. Certainly, DCS could and should respond with appropriate concern and measure to a positive screen for methamphetamine. Further, the initial report to DCS in April 2017 involved suspected drug use and Mother's possession of suspected drug paraphernalia in her room. Mother also makes the argument that the trial court's order "failed to address [her] compliance" with some goals or DCS-recommended services, as well as services that she initiated on her own accord, such as when she sought assistance through Clean Slate. *Appellant's Brief* at 20. However, we find these arguments amount to requests to reweigh evidence which we will not do on appeal.

[35] The trial court's determination that there is a reasonable probability that the conditions that resulted in the removal of the Children will not be remedied is supported by clear and convincing evidence. I.C. § 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, having upheld the trial court's conclusion under I.C. § 31-35-2-4(b)(2)(B)(i), we need not review the trial court's determination that continuation of the parent-child relationship would pose a threat to the Children's well-being.

### b. Best Interests

[36] Mother also asserts that the evidence was insufficient to support the trial court's determination that termination was in the Children's best interests. In making this best-interests determination, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*,

994 N.E.2d 278, 290 (Ind. Ct. App. 2013). The court must subordinate the interest of the parent to those of the children and need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[37] Here, the record reflects that the Children thrived while in the Lowerys' care and also did well while placed with other foster parents, but regressed and experienced emotional and behavioral problems while in Mother's care and after visitations with her. CASA Erne specifically stated that it was not in the Children's best interests to spend time with Mother. FCM Merriman opined that the conditions resulting in removal would not be remedied, and she and CASA Erne both recommended termination. Under the circumstances of this case, we conclude DCS presented sufficient evidence to show by clear and convincing evidence that termination was in the best interests of the Children.

### c. Satisfactory Plan

[38] Mother next challenges whether there is sufficient evidence that DCS has a satisfactory plan for the care and treatment of the Children following termination. Here, the Children were with the Lowerys from May 2017 to July 3, 2018. CASA Erne recommended termination of parental rights and adoption by the Lowerys, and Mrs. Lowery testified that if termination was granted, she and her husband desired to adopt the Children. FCM Merriman testified that DCS's plan for the Children was "[a]doption with the Lowerys." *Transcript* at 142. Mother argues that the Lowerys caused trauma or damage to the Children by "abandon[ing]" them in July 2018 and that "[r]egardless of Mother's situation, the Lowerys are not a suitable placement." *Appellant's Brief* at 39, 41. The issue is not whether the Lowerys are suitable. The issue is whether DCS has a satisfactory plan. Our courts have held that "[the] plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re D.D.*, 804 N.E.2d at 268. DCS's evidence satisfies this requirement.

[39] The trial court's decision to terminate Mother's parental rights was not contrary to law.

[40] Judgment affirmed.

Robb, J. and Bradford, C.J., concur.